IN THE MATTER OF JOEL L. SHAIN, POLICE DIRECTOR
AND JOEL L. SHAIN, MAYOR.

Argued December 6, 1982—Decided March 16, 1983.

*William C. Slattery* argued the cause for appellant, Joel L. Shain, etc.

*Cecil J. Banks* argued the cause for respondent, City Council of the City of Orange (*Owens, Banks & Williams,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

The issue here is whether a Special Investigatory Committee of the City Council of a Mayor-Council Plan D Faulkner Act municipality has the authority to issue subpoenas to compel the testimony of the Mayor and other executive municipal officials.

The Appellate Division, in an unpublished opinion, affirmed the trial court's order holding that the Special Investigatory Committee of the Orange City Council had the authority to subpoena the Mayor and other executive municipal officials. We granted the Mayor's petition for certification, 91 *N.J.* 238 (1982), and now affirm.[1]

---

[1]This Court contemporaneously denied certification, 91 *N.J.* 238 (1982), of a separate petition by the Mayor in the related case of *Joel L. Shain v. City Council of the City of Orange,* which concerned issues not pertinent to this appeal.

## I.

On May 13, 1980, Joel L. Shain was elected Mayor of the City of Orange, a municipal corporation organized under Mayor-Council Plan D of the Faulkner Act, *N.J.S.A.* 40:69A–1 to –210.[2] Immediately upon assuming office in July, 1980, the Mayor named a Lieutenant in the Orange Police Department as Acting Police Director to fill the vacant position of Police Director. The appointee's name was submitted to the City Council for confirmation. This appointment fomented a political conflict between the Council and the Mayor, which culminated in this lawsuit.

On September 2, 1980, the City Council established by resolution a special investigatory committee ("the Committee"), comprising the entire Council, to investigate allegations that the new Acting Police Director had interfered with the duties of the Orange Chief of Police. The Committee conducted a public hearing on September 9, 1980, at which the Police Chief, Deputy Chief, and Acting Director voluntarily testified about their respective duties, and the procedures followed in a then-recent departmental reorganization. One week later, the Committee

---

[2]From the inception of the Faulkner Act in 1950 through January 9, 1982, the enabling statute authorized six basic plans of Mayor-Council governance, known individually as Plans "A", "B", "C", "D", "E" and "F". *N.J.S.A.* 40:69A–31 to 40:69A–80. The six plans, structurally identical with respect to the division of local powers, merely offered variations of the electoral aspects of the basic Mayor-Council Plan, such as the size of the Council, partisan or non-partisan elections, ward or at-large representation, and staggered or non-staggered council terms. All of the plans incorporated the Plan A language in *N.J.S.A.* 40:69A–37 concerning the powers of the Council, which is at issue in this case. *See N.J.S.A.* 40:69A–49 (Plan B); *N.J.S.A.* 40:69A–55 (Plan C); *N.J.S.A.* 40:69A–61 (Plan D); *N.J.S.A.* 40:69A–68 (Plan E); *N.J.S.A.* 40:69A–74 (Plan F). Thus, the fact that the citizens of Orange chose to adopt Plan D rather than some other authorized Mayor-Council plan under the Faulkner Act is of no moment to this analysis. In 1981, the Legislature recodified the statute so that the elements of all six plans would appear under one general article at *N.J.S.A.* 40:69A–31 to –44 authorizing Mayor-Council forms of local government. This recodification also has no substantive bearing upon the present case.

held another public hearing. Although it heard no testimony at that time, the Committee agreed to adopt preliminary findings of fact from the initial hearing and to hold the investigation open for further testimony.

In the meantime, the Council refused to confirm the Mayor's candidate for Police Director. As a result of this action, on or about October 15, 1980, the Mayor named himself Acting Director of the Police Department.

On October 16, 1980, the City Council, sitting as the Committee, adopted a resolution that incorporated the Committee's preliminary findings of fact. The resolution recited that the Mayor's appointed Acting Police Director had interfered with the duties of the Police Chief and that such interference potentially endangered the health and welfare of the people of the City of Orange.

The Committee reconvened *in camera* on December 10, 1980. The key witness at this meeting was a former Orange official, whose testimony dwelled mainly upon matters irrelevant to the investigation and outside the scope of the resolution. On the next day, December 11, 1980, the Committee subpoenaed five police officers to testify *in camera* before it. Their testimony, some of which was not germane to the investigation, repeatedly criticized the Mayor and his former Acting Police Director for injecting politics into the operation of the Police Department.

The Committee then subpoenaed certain additional police officers to appear at a later hearing scheduled for December 18, 1980. In response, the Mayor issued an executive order prohibiting any member of the Orange Police Department from testifying before the Committee and ordered that transcripts of the prior December meetings be sent to federal, state, and county law enforcement agencies for appropriate action.[3] The Mayor

---

[3]The Mayor initially had not objected to the formation of the Committee. His first challenge to the Committee's authority was voiced after its December 10, 1980 hearing.

later stated in an affidavit that he had issued that order because he had believed that the Council was not acting in good faith and had gone beyond the scope of its original resolution.[4]

Early in January, 1981, the Mayor advised the Committee that he would not comply with any subpoena it might issue to him. Undaunted by that warning, the Committee went ahead and served the Mayor with a subpoena to testify before the Committee later that month. The Mayor failed to appear at the scheduled hearing.

The Committee then instituted an action in the Superior Court, Law Division, for an order to show cause why the Mayor, both as Mayor and as Acting Director of Police, should not comply with the subpoena, and why he should not be held in contempt for his failure to comply. The Mayor responded with an answer and a counterclaim for an order in lieu of a common-law writ of prohibition to stop the investigation and to quash the subpoena, asserting that the issuance of the subpoena was not authorized by statute. The Law Division judge held that the City Council had the right as a matter of law to conduct an investigation pursuant to its resolution of September 2, 1980, and the power to issue subpoenas in connection with such a legislative investigation.

The Appellate Division affirmed the lower court's order for the reasons set forth in the opinion below.

## II.

The legislative history of the Faulkner Act[5] makes clear that under a Mayor-Council form of local government, the elected Council exercises the municipality's legislative power.

---

[4]The trial court held that the Council's investigation had been performed in good faith. We denied certification of that issue. Hence, the question of good faith is not before us.

[5]The official short title of the Faulkner Act is the "Optional Municipal Charter Law." *N.J.S.A.* 40:69A–210.

See *Local Self-Government: A Proposed Optional Charter Plan, Second Report of the N.J. Commission on Municipal Government,* at 4 (1950) (hereinafter, "1950 Commission Report"). This intent is embodied in *N.J.S.A.* 40:69A–36 [6] and *N.J.S.A.* 40:69A–61 (applying *N.J.S.A.* 40:69A–36 to Mayor-Council Plan D municipalities). By voluntarily choosing to pattern their city government after an optional Mayor-Council plan, the citizens of Orange have affirmatively vested their elected Council with such legislative powers.

■ A concomitant of the power to legislate is the power to investigate for legislative purposes. This principle has long been recognized by both the federal and the state judiciary. *In re Zicarelli,* 55 *N.J.* 249, 263 (1970), aff'd *sub. nom., Zicarelli v. State Comm'n of Investigation,* 406 *U.S.* 472, 92 *S.Ct.* 1670, 32 *L.Ed.2d* 234 (1972); *Massett Building Co. v. Bennett,* 4 *N.J.* 53, 58–59 (1950). In *McGrain v. Daugherty,* 273 *U.S.* 135, 47 *S.Ct.* 319, 71 *L.Ed.* 580 (1927), the United States Senate had directed one of its committees to investigate charges of maladministration in the Department of Justice. That committee then subpoenaed the brother of the Attorney General, in connection with their investigation of his sibling's Department. In rejecting the brother's attack on the subpoena, the Supreme Court broadly approved the Senate's investigative powers in furtherance of its legislative function. Writing for the majority in *McGrain,* Justice Van Devanter observed:

We are of opinion that the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary of the legislative function. [*Id.* at 174, 47 *S.Ct.* at 328, 71 *L.Ed.* at 593 (emphasis added).]

Thus, legislative investigations, whether by standing or special committees, are "an established part of representative government." *Tenney v. Brandhove,* 341 *U.S.* 367, 377, 71 *S.Ct.* 783, 789, 95 *L.Ed.* 1019, 1027, *reh'g den.,* 342 *U.S.* 843, 72 *S.Ct.* 20, 96

---

[6]"The legislative power of the municipality shall be exercised by the municipal Council, except as may be otherwise provided by general law." *N.J.S.A.* 40:69A–36.

*L.Ed.* 637 (1951). "As elsewhere, we in New Jersey have recognized the need and validity of investigations designed to facilitate the proper exercise of the legislative function." *Eggers v. Kenny,* 15 *N.J.* 107, 117 (1954). *See also Bd. of Trustees v. Union City,* 112 *N.J.Super.* 484 (Ch.Div.1970), aff'd 116 *N.J.Super.* 186 (App.Div.1971) (validating municipal committee's jurisdiction to investigate operations of local public library); *Bd. of Educ. v. Union City,* 112 *N.J.Super.* 493 (Law Div.1970), aff'd 118 *N.J.Super.* 435 (App.Div.1972) (city governing body could investigate conduct of board of education); *Wintermute v. Ellenstein,* 117 *N.J.L.* 274 (Sup.Ct.1936) (upholding authority of municipal committee to investigate acts of subordinate public employees).

■ The legislative power conferred upon the Council by *N.J.S.A.* 40:69A–36 implicitly includes the power to investigate. The drafters of the Faulkner Act plainly contemplated that under a Mayor-Council [7] form of government, the council would be empowered to undertake "the investigation of departments and the removal of municipal officers for cause." *1950 Commission Report* at 4. This legislative intent is supplemented in *N.J.S.A.* 40:69A–37(a), which applies to all Mayor-Council governments formed under the Faulkner Act:

> The council, in addition to such other powers and duties as may be conferred upon it by this chapter or otherwise by general law, may:
>
> (a) require any municipal officer, in its discretion, to prepare and submit sworn statements regarding his official duties in the performance thereof, and otherwise to investigate the conduct of any department, office, or agency of the municipal government * * *.[8] [*N.J.S.A.* 40:69A–37(a).]

---

[7] The Mayor-Council plans proposed by the Commission on Municipal Government were originally entitled the "Strong-Mayor Plans." *See Local Self-Government in New Jersey: A Proposed Optional Charter Plan, Preliminary Statement of the Commission on Municipal Government,* at 35–42 (1948). The adjective "strong" was dropped in subsequent proposals, perhaps suggesting an intent to de-emphasize the Mayor's powers vis-a-vis the Council.

[8] While a literal reading of 40:69A–37(a) provides that the Council may require only a "municipal officer," rather than the Council, to investigate the conduct of his or her department, such interpretation is not consistent with

Thus, under both legal principles and statutory law, the Orange City Council has legislative power and the concomitant power to investigate in furtherance of its legislative function.

### III.

The Mayor does not contend that the Council lacked the authority to form the Committee or that the investigatory purpose of the Committee as set forth in its resolution was beyond its legislative purview. Rather, the Mayor contends that because no statute expressly gives the Council the authority to issue subpoenas, it has no such power.

We disagree.

No specific statutory grant is necessary to vest a legislative body with subpoena power. While "a subpoena must be issued pursuant to constitutional and legislative authority," *Reiman v. Breslin,* 175 *N.J.Super.* 353, 356 (App.Div.1980), certif. den. 85 *N.J.* 147 (1980), such authority may be fairly implied from the legislative scheme without being expressly stated within the four corners of a statute. *N.J. Const.* (1947) Art. IV, § 7, ¶ 11. The power to compel testimony is inherent in the legislative power to investigate. For example, in *McGrain v. Daugherty,* the United States Senate could point to no federal statute specifically authorizing it to issue a subpoena. Yet, the Supreme Court upheld the issuance:

A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite

---

legislative intent and leads to the impractical result that only the municipal officer in charge of the department and whose actions may be in question could investigate his or her own department. Where literal interpretation is not consistent with legislative intent or leads to unreasonable results, courts have modified the words of the statute or permitted the elimination of words to clarify its meaning. 2A Sutherland, *Statutory Construction* §§ 47.07, 47.36 (4th ed. 1973). Thus, we reject the proffered literal reading and adopt the sounder, if less grammatical, view that the *Council* is the party that has the power "to investigate."

information—which not infrequently is true—recourse must be had to others who do possess it. Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed. [273 *U.S.* at 175, 47 *S.Ct.* at 329, 71 *L.Ed.* at 593]

    \*     \*     \*     \*     \*     \*     \*     \*

[S]tate courts quite generally have held that the power to legislate carries with it by necessary implication ample authority to obtain information needed in the rightful exercise of that power, and to employ compulsory process for the purpose. [*Id.* at 165, 47 *S.Ct.* at 325, 71 *L.Ed.* at 589].

In the instant case, we need not rely merely on the well-established principles heretofore discussed to support the Council's power to issue a subpoena. The language and purposes of the Faulkner Act establish that the Legislature intended the Council under a Mayor-Council government to have the power to issue subpoenas in the exercise of its proper legislative function.

A reasonable incident of the Council's power to investigate under *N.J.S.A.* 40:69A–37 is the power to compel testimony, *i.e.*, to issue subpoenas. *McGrain,* 273 *U.S.* at 175, 47 *S.Ct.* at 329; *Eggers,* 15 *N.J.* at 121; *Wintermute,* 117 *N.J.L.* at 277; *Bd. of Trustees v. Union City,* 112 *N.J.Super.* at 490; *Newark v. Benjamin,* 144 *N.J.Super.* 58, 69 (Ch.Div.1976), aff'd o.b., 144 *N.J.Super.* 389 (App.Div.1976), aff'd o.b., 75 *N.J.* 311 (1978). Unless an investigating committee has power to compel testimony, it has no feasible method to obtain all the information it needs to perform its legislative function. *Newark v. Benjamin,* 144 *N.J.Super.* at 72. Without the power to interrogate knowledgeable officials under oath, its investigation may become a nullity.

If the Mayor's contentions here were correct, the Committee would be unable to issue a subpoena in furtherance of a legitimate municipal investigation. Such a result senselessly would prevent the Council from properly performing its legislative functions in monitoring the operation of the city government and in developing ordinances to address local needs. The ability of the Council to require sworn statements of municipal officers under *N.J.S.A.* 40:69A–37 may not be sufficient for it to fulfill its legislative duties. Such documents are often self-serving and do not permit the Council an opportunity for cross-examination.

Further, *N.J.S.A.* 40:69A–37 specifically provides that the Council retains such other powers and duties conferred upon it under the Faulkner Act "or otherwise by general law." In *N.J.S.A.* 40:69A–28, "general law" is defined as "any law or provision of law, not inconsistent with this act, heretofore or hereafter enacted which is by its terms applicable or available to all municipalities."

*N.J.S.A.* 40:48–25, a provision that predates the Faulkner Act, provides as follows:

> When the governing body of a municipality shall have appointed a committee of its members upon any subject or matter within its jurisdiction, the committee may issue a subpoena ad testificandum, or subpoena duces tecum, to *any person* within this state, to appear before it to give testimony or information required. The subpoenas may be served by any police officer or constable of the municipality. [*N.J.S.A.* 40:48–25 (emphasis added).]

*N.J.S.A.* 40:48–25 is applicable here. By its terms, it is a "general law," applicable and available to all communities. In addition, the subpoena power it confers is not at odds with the statutory scheme of the Faulkner Act. The Council's right to subpoena "any person," including the Mayor *qua* Mayor or the Mayor *qua* Police Director, is wholly consistent with the Faulkner Act's delegation of investigatory power to the Council in *N.J.S.A.* 40:69A–37.[9] Under *N.J.S.A.* 40:69A–28, the subpoena power generally authorized by *N.J.S.A.* 40:48–25 is also applicable to Faulkner Act municipalities. *Accord Newark v. Benjamin,* 144 *N.J.Super.* at 69, 72 n. 4.

We further see no merit in the Mayor's argument that *N.J.S.A.* 40:48–25 is not applicable here because under the Mayor-Council form of government the phrase "governing body" must include both the Mayor and the Council. Under this theory, both the Council and the Mayor would have to agree to the issuance of the subpoena here.

---

[9] For purposes of this opinion, it does not make any difference whether the Mayor was subpoenaed in his capacity as Mayor or in his capacity as Acting Police Director. See discussion *infra,* at 536–537.

The Mayor bases this claim on language in *N.J.S.A.* 40:69A–62, which provides that the municipality "shall be governed by an elected council, and an elected mayor and by such other officers and employees as may be duly appointed * * *." This general language cannot support appellant's position without considerable explanation. *N.J.S.A.* 40:69A–62 merely states the obvious proposition that the responsibilities of local governance in a Mayor-Council municipality are jointly shared; it does not establish *how* they are shared. The term "governing body" is defined neither in the Faulkner Act nor in *N.J.S.A.* 40:48–25. In various cases concerning municipalities, the term "governing body" is interpreted in many different ways, depending on its context. *See, e.g., Kagan v. Caroselli,* 30 *N.J.* 371 (1959) (outlining the various acceptable definitions of "governing body" in Walsh Act municipalities); *Shapiro v. Essex County Bd. of Freeholders,* 183 *N.J.Super.* 24 (App.Div.), aff'd 91 *N.J.* 430 (1982) ("governing body" under county executive form of government includes both board of freeholders and county executive).

Since the statutory language provides no guidance for determining the meaning of "governing body," we therefore consider the term as used in this particular context. *N.J.S.A.* 40:69A–37, the statute granting the power to investigate to which the subpoena power corresponds, is written solely in terms of the Council. Since the subpoena here was issued in furtherance of the Council's legislative function, the Mayor's participation in its issuance would be an improper intrusion upon that function. Presumably, the Mayor himself would have disapproved of a Council subpoena requiring him to testify. His veto power over the subpoena would thereby have thwarted the whole investigation. Surely this was not the intendment of the Legislature. We therefore hold that for the purposes of an investigation pursuant to *N.J.S.A.* 40:69A–37, the local Council is the "governing body." *Accord Newark v. Benjamin,* 144 *N.J.Super.* at 69; *Traino v. McCoy,* 187 *N.J.Super.* 638 (Law Div.1982).

Thus, under the statutory language of *N.J.S.A.* 40:69A–37, *N.J.S.A.* 40:69A–28, and *N.J.S.A.* 40:48–25, we hold that the Legislature intended to give the Committee the right to issue subpoenas to fulfill its legislative function of investigation.

## IV.

The Mayor contends that the doctrine of separation of powers prohibits the Council from issuing subpoenas. Specifically, he claims that *N.J.S.A.* 40:48–25 is not applicable, because it was never meant to apply to the Mayor-Council Faulkner Act plans—such as Plan D—where the separation of legislative and executive powers is a critical element in the governmental scheme. Accordingly, it cannot be considered a general law consistent with the aims of the Faulkner Act. Under the Mayor's position, permitting the legislative branch to issue subpoenas violates the separation of powers doctrine.

We reject this position. It is clear that even under federal separation of powers doctrine the legislative branch has the right to establish an investigatory committee that has the power to issue subpoenas to members of the executive branch in furtherance of a proper legislative purpose. See discussion, *supra*, at 530. As the Supreme Court stated in *Tenney v. Brandhove:*

> The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province. To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive. [*Tenney*, 341 *U.S.* at 378, 71 *S.Ct.* at 789, 95 *L.Ed.* at 1028].

*See also In re Zicarelli,* 55 *N.J.* at 263 (legislative investigation permissible absent a "threat to the essential integrity of the executive branch"). Here, the Committee, in properly exercising its legislative purpose, clearly did not usurp the Mayor's executive power.

The Mayor further contends that even if the Council has the right to issue subpoenas to certain executive municipal officials,

the separation of powers doctrine strictly prohibits the issuance of a subpoena to a Mayor. We do not agree.

In *LaGuardia v. Smith,* 288 *N.Y.* 1, 41 *N.E.2d* 153 (Ct.App. 1942), a case strikingly similar to the one before us, a Special Committee of the New York City Council issued a subpoena duces tecum to Mayor LaGuardia directing him to appear and testify before it and to produce certain documents. The Mayor moved to vacate and quash the subpoena alleging that he was immune therefrom under the doctrine of separation of powers. It was conceded that the Special Committee was pursuing a legitimate legislative purpose in its investigation.

The Court of Appeals held that the Mayor was not immune from the Council's subpoena:

> True, it [Charter of the City of New York] prescribed that the Mayor shall be 'the chief executive officer of the city' (Charter, §§ 3, 4, 5) and that the Council is 'the local legislative body of the city' (Id. § 21). But the fact that functions are exercised by the Mayor and the Council which are independent of each other is not enough, as we conclude, to entitle the Mayor to invoke immunities which he now asserts and which are accorded the executive under the Federal plan of government.

>     \*       \*       \*       \*       \*       \*       \*       \*

> In the absence of some principle of law or some legislative declaration of public policy to the contrary, we regard that section [giving the Council power of investigation] as broad enough to apply to the Mayor of the city. We have seen that the principle of the separation of powers applies only to the sovereign authority—not to the government of cities. [41 *N.E.2d* at 155–56.]

Similarly in New Jersey, the formal doctrine of separation of powers has been held inapplicable to municipalities. *See, e.g., Eggers v. Kenny,* 15 *N.J.* at 120–21; *Wintermute v. Ellenstein,* 117 *N.J.L.* at 276; *Bd. of Trustees v. Union City,* 112 *N.J.Super.* at 490. The Mayor correctly notes that those cases do not deal with a Mayor-Council form of government established under the Faulkner Act. But even though the separation of powers principles applied to federal and state governments are not strictly applicable to Mayor-Council forms of local government, the Faulkner Act plainly envisages some separation of *functions* between the Council (the legislative body) and the Mayor (the executive). *Cf. LaGuardia v. Smith,* 41 *N.E.2d* at 155 (separa-

tion of functions distinguished from separation of powers). We find that this separation of functions does impose certain limits on the Mayor and the local Council in governing the municipality.

However, the Mayor has misconstrued such limitations.[10] In bifurcating the functions of municipal government, the Faulkner Act did not intend to abridge the normal powers of investigation incident to the legislative branch. Accordingly, the courts should intervene only where the Council exceeds its legislative purpose in subpoenaing municipal officials. The Mayor intimates that the Council's investigation here was motivated, in part, by political factors. However, as long as a municipal committee's investigation has legitimate public ends, it is immaterial that political motivations are also present. *Eggers v. Kenny*, 15 *N.J.* at 125. The subpoena would, of course, be invalid if the Council issued it in bad faith or without a proper legislative purpose. *Id.* Nor could the subpoena transgress the Mayor's constitutionally-protected interests. *Id.* at 126. If the Mayor believes that the subpoena violates these norms, he may move before a court to have it quashed or modified. *R.* 1:9–6(b). *Eggers v. Kenny*, 15 *N.J.* at 126; *Massett Building Co.*, 4 *N.J.* at 63; *see also Finance Comm'n of Boston v. McGrath*, 343 *Mass.* 754, 180 *N.E.*2d 808 (1962) (modifying investigatory subpoena of municipal official).

In this case, the Council's subpoena of the Mayor and other Orange officials did not exceed the bounds of legislative propriety. The Council surely had the right to investigate complaints of disruption in the city police force and summon persons with information relevant to that issue. Although the hearings di-

---

[10]A Committee established by a Council under a Mayor-Council municipality that has only legislative power does not have as broad a right of investigation as a committee established under a governing municipal commission, which exercises both legislative and executive functions. *See Bd. of Trustees v. Union City*, 112 *N.J.Super.* at 490–91. Nevertheless, such a committee has the right to investigate and issue subpoenas for a proper legislative purpose.

gressed at times, we find that they were generally conducted within the Council's proper legislative sphere. We therefore hold that the Mayor and the other subpoenaed officials must comply with the Committee's requests for their testimony.

## V.

We conclude that the Council in a Mayor-Council Plan municipality exercises the legislative function of the local government. Inherent in this legislative power is the authority to investigate and to interrogate officials under oath, *i.e.*, to issue subpoenas in furtherance of its proper legislative function. This conclusion is supported by the statutory language of *N.J.S.A.* 40:69A–36, *N.J.S.A.* 40:69A–37 and *N.J.S.A.* 40:48–25 and the reasonable interpretation of such language.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For reversal*—None.