927 A.2d 129

ELLIOT S. STOMEL, PLAINTIFF–RESPONDENT AND CROSS–AP-PELLANT, v. THE CITY OF CAMDEN, GWENDOLYN FAISON AND THE CAMDEN CITY COUNCIL, DEFENDANTS–APPEL-LANTS AND CROSS–RESPONDENTS, AND MAYOR MILTON MILAN AND JOHN DOE(S) 1–10, INDIVIDUALLY, JOINTLY AND/OR IN THE ALTERNATIVE, DEFENDANTS.

Argued January 4, 2007—Decided July 25, 2007.

138

*John C. Eastlack, Jr.,* argued the cause for appellants and cross-respondents (*Holston, MacDonald, Uzdavinis, Eastlack, Ziegler & Lodge,* attorneys; *Cheryl L. Cooper,* on the briefs).

*Alan H. Schorr,* argued the cause for respondent and cross-appellant, (*Alan H. Schorr & Associates,* attorneys).

Justice LaVECCHIA delivered the opinion of the Court.

In December 1999, plaintiff Elliot Stomel, the municipal public defender for the City of Camden (City), testified as a witness for the United States Government in the political corruption trial of Camden's municipal prosecutor, Joseph Caruso. His testimony against Caruso implicated Camden's mayor, Milton Milan, in unlawful activity. The prosecution's case ended in a mistrial and, three days later, Mayor Milan informed Stomel in writing that he was being removed as Camden's municipal public defender after more than seventeen years of service. Stomel responded by filing two claims against the City. First, he alleged that he was removed from his position as municipal public defender in retaliation for "whistleblowing" contrary to New Jersey's Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8. He also filed a claim under 42 *U.S.C.A.* § 1983, alleging that he was removed from office in violation of his First Amendment rights under the United States Constitution.

The Appellate Division held that Stomel was an "employee" for purposes of advancing a claim under CEPA and reversed the entry of summary judgment in favor of the City on that claim. We agree and affirm the panel's judgment in respect of Stomel's CEPA claim. The panel also held, however, that the City could not be held vicariously liable for Milan's actions on the § 1983

claim. We disagree and, on that part of the panel's judgment, we reverse.

## I.

Stomel served part-time as Camden's municipal public defender from 1982 until 1999. After his initial appointment in 1982, he was reappointed annually through October 31, 1998. Written agreements between Stomel and the City were anything but consistent. For seven of his seventeen years, Stomel worked under one-year contracts. The remainder of those years was served without a new one-year contract, during which time Stomel continued under the terms and with the salary of his most recently expired annual contract. During the years when new contracts were negotiated, Stomel arranged the compensation terms with the municipal court's administrator through the submission of a request for approval that would result in the monthly rate to be paid for his municipal public defender services. For the entirety of his seventeen years as public defender, Stomel was paid a flat amount, monthly, for the representation of indigent defendants that he undertook for the City.

Stomel's last contract with the City provided for municipal public defender legal services to be rendered for the period November 1, 1997, though October 31, 1998, during which he was compensated at an annual rate of $30,000 paid in monthly installments. The contract was signed by Milan and approved by the City Council. Stomel continued to provide public defender services under the terms of that contract until he was removed from office on December 17, 1999.[1]

---

[1] The November 1, 1997, contract contained two termination provisions. First, a "Termination for Cause" provision allowed for Stomel's removal in the event he failed to fulfill his contractual obligations or otherwise violated any provision of the contract. In addition, the contract contained a "Termination for Convenience of the City" provision, which allowed the City to remove Stomel "at its convenience at any time" upon written notice.

During the Fall of 1997, Camden Municipal Prosecutor Joseph Caruso solicited a contribution from Stomel on behalf of Mayor Milan. According to Stomel, Caruso threatened that he could not guarantee Stomel's reappointment as municipal public defender unless he "contributed" $5,000 to Milan's re-election campaign. Stomel reported the incident to the Camden County Prosecutor's Office and to the Office of the United States Attorney. At the direction of the Camden County Prosecutor's Office, Stomel paid the $5,000 contribution and was reappointed as municipal public defender for the 1997–98 contractual period.

A federal investigation followed, resulting in Caruso's indictment. At Caruso's criminal trial, Stomel appeared as a government witness on December 7, 1999, and his testimony directly implicated Mayor Milan. On December 17, 1999, three days after a mistrial was declared, Milan sent a letter to Stomel advising that he was being replaced by another lawyer, who would be appointed as Camden's municipal public defender effective January 3, 2000, pending final approval by the City Council. *See N.J.S.A.* 40:69A–36(b) (providing municipal council with "advice and consent" power).

On December 28, 1999, Stomel filed a verified complaint and order to show cause against the City, Mayor Milan, and the City Council. The complaint alleged that Stomel was terminated from his position as municipal public defender for cooperating with investigators and testifying in Caruso's trial, in violation of the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –8. On December 29, 1999, the Law Division temporarily enjoined Mayor Milan and the City from appointing a new public defender. In a hearing on January 12, 2000, however, the trial court lifted the restraining order and permitted the City to appoint another public defender, but also ordered that Stomel could continue to represent the indigent public defender clients already assigned to him. Thereafter, on February 10, 2000, the Mayor's appointee for municipal public defender was not approved by the City Council. Milan was replaced as mayor by Gwendolyn Faison in December 2000. With Council approval, Mayor Faison appointed Frank

Fontanez as the City's new municipal public defender in March 2001.

In April 2001 Stomel filed an amended complaint, naming Mayor Faison as a defendant, and adding a claim under 42 U.S.C.A. § 1983.[2] Following defendants' motion for summary judgment, the Law Division dismissed Stomel's CEPA claims, concluding that Stomel was not an "employee" of the City within the meaning of the statute. The trial court also dismissed Stomel's § 1983 claims against Mayor Faison, the City, and the City Council. In dismissing the § 1983 claim against the City, the court determined that the City was not vicariously liable for the actions of Mayor Milan because Milan was "not the final decision-maker or policy-maker with regard to the Municipal Public Defender position." As a result, only Stomel's § 1983 action against Mayor Milan, in his personal capacity, went to trial. On that claim, a jury awarded Stomel $316,465 in damages.

On appeal, the Appellate Division affirmed the dismissal of Stomel's § 1983 action against the City. *Stomel v. City of Camden,* 383 *N.J.Super.* 615, 633, 893 *A.*2d 32 (App.Div.2006).[3] The panel reversed on the CEPA issue, however, finding that Stomel was an "employee" for CEPA purposes. *Id.* at 637, 893 *A.*2d 32. The parties filed cross-petitions for certification, which we granted. 188 *N.J.* 491, 909 *A.*2d 726 (2006).

## II.

### A.

■ We turn first to the viability of Stomel's § 1983 action against the City of Camden. Section 1983 sanctions civil claims

---

[2] Stomel's amended complaint also included a claim pursuant to 42 *U.S.C.A.* § 1985, which alleged that the defendants collectively conspired to violate his constitutional rights. That claim was dismissed as to all parties on summary judgment and is not implicated in this appeal.

[3] We note that Stomel did not appeal the dismissal of his § 1983 claims against Mayor Faison and the City Council.

against any state official who, acting under the color of state law, deprives any other individual of any right secured by the Constitution or laws of the United States. 42 *U.S.C.A.* § 1983. Although § 1983 does not create substantive rights, it serves as an important vehicle for the vindication of violations of existing federal rights. *Baker v. McCollan,* 443 *U.S.* 137, 144 n.3, 99 *S.Ct.* 2689, 2695, 61 *L.Ed.*2d 433, 442 (1979).

Here, Stomel claimed that his First Amendment right to free speech was violated when he was removed as municipal public defender in retaliation for reporting the extortion attempt, cooperating with investigators, and testifying at Caruso's corruption trial. The City conceded that the speech at issue involved matters of public concern and, therefore, it fell under the First Amendment's protection. *See, e.g., Bd. of County Comm'rs v. Umbehr,* 518 *U.S.* 668, 675, 116 *S.Ct.* 2342, 2347, 135 *L.Ed.*2d 843, 852 (1996) ("The First Amendment's guarantee of freedom of speech protects government employees from termination *because of* their speech on matters of public concern."). The question is only whether the City may be held vicariously liable for Milan's unconstitutional conduct.

Although local governments are "persons" for purposes of § 1983, a municipality generally cannot be held liable in a § 1983 action for the acts of employees under the principle of respondeat superior. *Monell v. Dep't of Soc. Servs.,* 436 *U.S.* 658, 690–91, 98 *S.Ct.* 2018, 2035–36, 56 *L.Ed.*2d 611, 635–36 (1978); *Loigman v. Twp. Comm. of Middletown,* 185 *N.J.* 566, 590, 889 *A.*2d 426 (2006). An exception exists when an official municipal "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," is the cause of the constitutional deprivation. *Monell, supra,* 436 *U.S.* at 694, 98 *S.Ct.* at 2037–38, 56 *L.Ed.*2d at 638. "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of*

*Cincinnati,* 475 *U.S.* 469, 479, 106 *S.Ct.* 1292, 1298, 89 *L.Ed.*2d 452, 463 (1986).

The term "official policy" usually refers to formal governmental rules or practices. *Id.* at 480–81, 106 *S.Ct.* at 1299, 89 *L.Ed.*2d at 463. Under appropriate circumstances, however, a single act or decision by a municipal policymaker can impute liability to the municipality. *Id.* at 480, 106 *S.Ct.* at 1298, 89 *L.Ed.*2d at 463; *Loigman, supra,* 185 *N.J.* at 590–91, 889 *A.*2d 426. The bounds of such municipal liability are circumscribed:

[N]ot every decision by municipal officers automatically subjects the municipality to § 1983 liability. Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable. Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.

[*Pembaur, supra,* 475 *U.S.* at 481–83, 106 *S.Ct.* at 1299–1300, 89 *L.Ed.*2d at 464–65 (footnotes and citation omitted); *see also Loigman, supra,* 185 *N.J.* at 591, 889 *A.*2d 426 (recognizing same).]

In *Loigman, supra,* we set forth several guiding principles for determining when a single act or decision of a municipal official is enough to establish an unconstitutional municipal policy:

First, the municipality faces § 1983 liability only for "acts which the municipality has officially sanctioned or ordered." Second, the municipality is subject to liability only for the acts of those officials "who have final policymaking authority." Third, state law determines "whether a particular official has final policymaking authority." Last, the unconstitutional "action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the [municipality's] business."

[185 *N.J.* at 591, 889 *A.*2d 426 (citations omitted) (quoting *City of St. Louis v. Praprotnik,* 485 *U.S.* 112, 123, 108 *S.Ct.* 915, 924, 99 *L.Ed.*2d 107, 118 (1988)).]

Consistent with that framework, Stomel's § 1983 action against the City cannot succeed unless Milan possessed "final policymaking authority" over the removal of public defenders.

## B.

The Municipal Public Defender's Act (MPDA), *N.J.S.A.* 2B:24–1 to –17, provides that a public defender can be removed "for good cause shown and after a public hearing," but that the "[f]ailure to reappoint a municipal public defender for a second or subsequent term does not constitute a 'removal from office.'" *N.J.S.A.* 2B:24–4(e). Part of the City's argument is that Stomel was not "removed" from office under the MPDA because the contractual term of his appointment had lapsed at the time Milan decided to appoint another municipal public defender.

Given the procedural posture in which this matter is before us, we find it unnecessary to address this aspect of the City's argument at length. Stomel was successful in his § 1983 civil action against Mayor Milan. In returning its verdict against Milan, the jury made a factual determination that Milan unlawfully removed Stomel from his position as municipal public defender for purposes of § 1983. In that trial, the jury found that "[p]laintiff's speech concerning the actions of Milan and Caruso was a substantial or motivating factor *for Milan's decision to terminate the Plaintiff's employment and/or services,*" and that Stomel would not have been "terminated" but for engaging in that speech activity. (Emphasis added). Those findings are memorialized in Stomel's Order of Judgment against Milan. The essential facts underpinning Stomel's § 1983 claim against Milan are the same as those necessary for determining whether the City may be vicariously liable for Milan's actions.[4] Although Stomel will have to make that showing to obtain a judgment on his claim against the City, it is plain that summary judgment in favor of the City was unwarranted. That the jury found in Stomel's favor in respect of the "removal" issue during the trial against Milan illustrates that, at the very least, a material issue of fact existed and further demon-

---

[4] Milan's trial was held after the City had been dismissed on summary judgment as a defendant in the action. Therefore, the proofs in support of Stomel's § 1983 claim that were adduced against Milan would have to become part of a record in respect of his claim against the City.

strates that a reasonable fact-finder could reject the City's asser-
tion that Stomel simply was not reappointed, as opposed to being
"removed" from office.

That said, the essential question is whether Milan had "final
policymaking authority" to remove Stomel as public defender.
The answer to that involves the intersection of the MPDA and the
Faulkner Act, *N.J.S.A.* 40:69A–1 to –210 (also known as the
Optional Municipal Charter Law).

The MPDA requires that every municipal government in the
State appoint at least one municipal public defender. *N.J.S.A.*
2B:24–3. The Legislature's intent in imposing that obligation on
municipalities was to ensure an effective system for the adminis-
tration of justice, particularly for those who cannot afford ade-
quate legal representation. *N.J.S.A.* 2B:24–1. Under the MPDA,
public defenders are appointed by the municipality's "governing
body," *N.J.S.A.* 2B:24–3, and "serve for a term of one year from
the date of [their] appointment," *N.J.S.A.* 2B:24–4(a). Thus, the
statute plainly contemplates the regular issuance of annual con-
tracts for the provision of municipal public defender services. In
respect of the removal of municipal public defenders, the MPDA
specifies:

> In addition to any other means provided by law for the removal from office of a
> public official, a municipal public defender may be removed by the governing body
> of a municipality for good cause shown and after a public hearing, and upon due
> notice and an opportunity to be heard. Failure to reappoint a municipal public
> defender for a second or subsequent term does not constitute a "removal from
> office" within the meaning of this subsection.
>
> [*N.J.S.A.* 2B:24–4(e).]

█ The term "governing body" is not defined in the MPDA.
Because the statute does not specify a particular governmental
actor in its reference to "governing body," we assume as we have
on other occasions that the Legislature intended the term to apply
to whatever governmental actor is vested within its respective
municipality with removal authority over a position such as a
public defender. *See, e.g., In re Shain,* 92 *N.J.* 524, 535, 457 *A.*2d
828 (1983) (stating that because Legislature provided no guidance

for determining meaning of term " 'governing body,' we therefore consider the term as used in this particular context"). In various cases, this Court's interpretation of the term "governing body" has depended on the context in which it was being applied. *See, e.g., ibid.* (interpreting "governing body" in context of Faulkner Act to mean local council); *Kagan v. Caroselli,* 30 *N.J.* 371, 375–77, 153 *A.*2d 17 (1959) (outlining various acceptable definitions of "governing body" in Walsh Act municipalities); *Shapiro v. Essex County Bd. of Chosen Freeholders,* 183 *N.J.Super.* 24, 26–29, 443 *A.*2d 219 (App.Div.), *aff'd,* 91 *N.J.* 430, 453 *A.*2d 158 (1982) (finding that "governing body" under county executive form of government includes both board of freeholders and county executive). Previous constructions of the term "governing body" likely informed the Legislature when it used that same term in the MPDA. We conclude that the MPDA's reference to "governing body" was merely a shorthand reference to the Faulkner Act and to the specific municipal government structure (with its division of authority) that applies to the municipality at issue—in this case, Camden.

"The Faulkner Act is an elective statutory scheme that authorizes participating municipalities to choose between four plans of government that are set forth in the Act." *McCann v. Clerk of Jersey City,* 167 *N.J.* 311, 324, 771 *A.*2d 1123 (2001). Camden is a Faulkner Act municipality, having opted for the mayor-council plan of government. *See N.J.S.A.* 40:69A–31 to –67.2. The mayor-city council governance structure provides for an elected council and an elected mayor. *N.J.S.A.* 40:69A–32(a). Pursuant to the Act, "[t]he legislative power of the municipality [is] exercised by the municipal council," *N.J.S.A.* 40:69A–36, whereas the executive power of the municipality is allocated to the mayor, *N.J.S.A.* 40:69A–39. *See Mun. Council of Newark v. James,* 183 *N.J.* 361, 366, 873 *A.*2d 544 (2005) ("Stated generally, then, the mayor-council plan under the Faulkner Act vests in the mayor the responsibility for administrative and executive operations of the municipality, while reposing the ultimate legislative and concomitant investigative responsibilities in the council."). When it is

necessary to construe the Faulkner Act with other applicable statutes, the Act similarly delineates between powers reserved for the municipal council and those allocated to the mayor:

> For the purpose of the construction of all other applicable statutes, unless the explicit terms and context of the statute require a contrary construction, any administrative or executive functions assigned by general law to the governing body shall be exercised by the mayor, and any legislative and investigative functions assigned by general law to the governing body shall be exercised by the council.
>
> [*N.J.S.A.* 40:69A–32(b).]

We have noted that the Faulkner Act "plainly envisages some separation of functions between the Council (the legislative body) and the Mayor (the executive)." *In re Shain, supra,* 92 *N.J.* at 537, 457 *A.2d* 828 (emphasis omitted). Principles of separation of powers have been found applicable to the mayor-council plan of government. *Casamasino v. City of Jersey City,* 158 *N.J.* 333, 343, 730 *A.2d* 287 (1999) (stating that "[w]here one branch of government has been specifically vested with the authority to act in a prescribed manner, neither of the other branches may usurp that authority").

The Faulkner Act vests numerous powers and responsibilities to a municipal council. *See N.J.S.A.* 40:69A–36 to –38. For our purposes, we are concerned with the Act's allocation to a municipal council of the power to remove municipal officers. Specifically, the council can itself remove a municipal officer for cause, and it can express disapproval of the mayor's removal of a municipal officer. *N.J.S.A.* 40:69A–36(d), (e); *see also N.J.S.A.* 40:69A–37 (authorizing council to "[r]emove, by at least two-thirds vote of the whole number of the council, any municipal officer, other than the mayor or a member of council, for cause, upon notice and an opportunity to be heard").

The Faulkner Act also grants to a mayor the corollary power to remove department heads and other municipal executive officers pursuant to *N.J.S.A.* 40:69A–43(c):

> The mayor may in his discretion remove any *department head* and, subject to any general provisions of law concerning term of office or tenure, *any other municipal executive officer* who is not a subordinate departmental officer or

employee, after notice and an opportunity to be heard. Prior to removal the mayor shall first file written notice of his intention with the council, and such removal shall become effective on the twentieth day after the filing of such notice unless the council shall prior thereto have adopted a resolution by a two-thirds vote of the whole number of the council, disapproving the removal.

[(Emphasis added).]

The mayor's removal power thus is restricted in that it is subject to being vetoed when the Council exercises its disapproval authority. Nonetheless, the Act confers on the mayor the power to act to remove a department head and other municipal executive officers.

### C.

In this matter, we observe initially that the record demonstrates that Milan was, by implication as well as by official council resolution, the authorized decision-maker responsible for contracting with Stomel for public defender services. Each contract appointing Stomel as public defender did so pursuant to an official City Council resolution. Those resolutions authorized and directed "proper officers of the City of Camden" to execute contracts with Stomel for public defender services. There is no dispute that Milan was ultimately responsible for the negotiation of contracts with Stomel on behalf of the City for public defender services and that he personally executed the last written contract between the parties signed in November 1997.

That said, we turn then to the question of who was vested with removal power over the municipal public defender. As the appointed municipal public defender receiving a flat amount of remuneration per month, which was not determined based on the number of cases or hours spent by Stomel representing indigent defendants in Camden's municipal court, Stomel was the equivalent of a self-contained municipal department unto himself. To regard him as the equivalent of a department head, or the executive officer of this municipal responsibility, requires no great leap.

The municipal public defender function was required to be performed, *see N.J.S.A.* 2B:24–3, and the City opted to have a

designated person as its municipal public defender to handle its representation obligation for indigent municipal defendants. Unlike the Appellate Division, we regard Stomel's function as the municipal public defender to be part of the required functioning of municipal executive responsibilities. He performed that duty *in toto*, not on a case-by-case basis or hourly paid basis. He was *the* municipal public defender for the City. He thus was the equivalent of an executive department head or officer, rendering him clearly within the ambit of those municipal "officers" subject to removal by the mayor, unless countermanded by the Council.[5] *Cf. Sunkett v. Misci,* 183 *F.Supp.*2d 691, 709, 711 (D.N.J.2002) (recognizing mayor's authority to fire attorney in City's law department); *Bowles v. City of Camden,* 993 *F.Supp.* 255, 267–69 (D.N.J.1998) (noting that head of city public works department was subject to removal by mayor).

Indeed, we note that Milan testified that he believed he had the authority, as mayor, to remove Stomel from office. And remove him he did, following Stomel's testimony in the corruption trial. We read Milan's letter to Stomel as nothing less than a termination letter. It informed Stomel in no uncertain terms that he was being removed as municipal public defender *before* a replacement municipal public defender had been authorized to take office.[6] Stomel was relieved of a position that he had held, and he

---

[5] That Stomel was operating through his private practice, and not through the City's in-house Law Department, reflects the conflict of interest concerns permeating the practical provision of legal representation to those persons being prosecuted by the City. However, Stomel still was performing a necessary municipal function on behalf of the City.

[6] After Milan's removal letter, Camden's Municipal Court Judge began assigning new public defender clients to other attorneys on a per diem basis, but primarily to Frank Fontanez. The record indicates that Stomel was not assigned any new public defender clients from the time he was removed by Milan until the time he was officially replaced by the appointment and approval of Fontanez to the office in March 2001. We note, however, that the City asserts that it paid Stomel as if he had been performing as public defender until Fontanez was approved as Camden's municipal public defender.

alleges he likely would have continued to hold, as he had for seventeen years with and without written contracts, but for Milan's retaliatory action ejecting him from the office.

Even though the Council, in arguing this point, attempts to stand on the ceremony of not having been served with notice of Milan's intention to remove Stomel, *see N.J.S.A.* 40:69A–43(c), the fact is that by virtue of Stomel having brought this action, the Council had effective notice of the removal and could have disapproved it. It did not. Instead, the Council effectively ratified the Mayor's action when it did not exercise its veto power.

In conclusion, we have no doubt in these circumstances that Milan was the policy-maker for the City in respect of Stomel's removal as municipal public defender before a replacement had been authorized to assume the office. Although another attorney was the mayor's preferred appointee, that appointment could not become effective unless and until it had been blessed by the Council. *See N.J.S.A.* 40:69A–36(b). In fact, the Council disapproved the mayor's selection for replacing Stomel, yet the Council also ratified Milan's removal of Stomel as municipal public defender by not acting to stop it. The City Council can not be permitted to step away, in this fashion, from the authority that it conferred on Milan. Accordingly, we reverse the Appellate Division's judgment that affirmed the entry of summary judgment in favor of the City. We reinstate Stomel's § 1983 claim against the City and we remand the matter for the development of a record before the Law Division in respect of that claim as against this previously dismissed defendant.

### III.

The Appellate Division also held that the trial court erred when it concluded that Stomel was not an "employee" for purposes of bringing a CEPA claim against the City.

CEPA prohibits an employer from retaliating against an employee who engages in protected whistleblower conduct. *See N.J.S.A.* 34:19–1 to –8; *Abbamont v. Piscataway Twp. Bd. of*

*Educ.,* 138 *N.J.* 405, 417, 650 *A.*2d 958 (1994). Stomel claims that he was removed as municipal public defender for reporting the extortion attempt and for providing testimony in Caruso's political corruption trial that implicated Milan. Stomel's speech undoubtedly would qualify as protected conduct under CEPA's provisions. *See N.J.S.A.* 34:19–3(a), (c)(1). The threshold question that halted his claim of retaliation before the trial court is whether he qualifies as an "employee" for CEPA's protections.

■ Our decision in *D'Annunzio v. Prudential Insurance Co. of America,* 192 *N.J.* 110, 125, 927 *A.*2d 113, 122 (2007), reaffirmed our belief in the standards set forth by the Appellate Division in *Pukowsky v. Caruso,* 312 *N.J.Super.* 171, 182–83, 711 *A.*2d 398 (1998), for assessing whether the work relationship that exists between an employer and a professional person, or other contractor of specialized services, can render that individual an "employee" for purposes of seeking CEPA's protection. The *Pukowsky* test identifies twelve factors to be used in that analysis:

(1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation—supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.

[312 *N.J.Super.* at 182–83, 711 *A.*2d 398 (quoting *Franz v. Raymond Eisenhardt & Sons, Inc.,* 732 *F.Supp.* 521, 528 (D.N.J.1990)).]

As noted in *D'Annunzio, supra,* that test focuses on three overarching considerations that are important when examining a contractor's relationship with an employer for purposes of CEPA applicability. 192 *N.J.* at 123, 927 *A.*2d at 121. One of those three is the degree to which there has been a functional integration of the employer's business with that of the so-called "independent" person's work (*Pukowsky* factor nine). *Ibid.*

In *D'Annunzio, supra,* we expounded on the type of question that will elicit the level of functional integration of worker and

employer that will be sufficient to demonstrate "employee" status and therefore entitle an individual to bring a CEPA claim. *Ibid.* Those questions, which have relevance in the instant matter, included determining whether the work is continuous and directly required for the employer's operations, as opposed to intermittent and peripheral. They also included examination of whether the professional must be routinely or regularly at the disposal of the employer as opposed to being available to the public for professional services on his or her own terms.

The Appellate Division below recognized that a traditional right-to-control test should not be the exclusive determiner of whether a professional is an employee for CEPA purposes. *Stomel, supra,* 383 *N.J.Super.* at 636, 893 *A.*2d 32 ("A simple application of the control test would be inappropriate under these circumstances."). The panel explained that the nature of Stomel's work as an attorney representing the City's indigent defendants required that he exercise independent professional judgment for his clients without City supervision. *Ibid.* Accordingly, the panel engaged in an analysis that appropriately looked at the City's integration of Stomel's work and downplayed, in significance, that Stomel was under contract for a fixed annual payment, untethered to the number of cases specifically assigned to him or the amount of time he would be called on to expend in any particular matter. Stomel simply had to be available to the City's indigent defendants who were entitled to representation provided by the City.

Viewing the facts identified by the panel below through the prism of the test that we described at length in *D'Annunzio,* we agree that summary judgment should not have been granted to defendants on whether Stomel was an employee for purposes of advancing his CEPA claim. As the panel stated,

the City is required to provide a public defender. In filling that position, [Stomel]'s employment required him to represent clients assigned to him by the City, and to appear in court at designated times. While he maintained his own private business with his own support staff, he was paid by the City with a monthly check based on a yearly salary. He was not paid individually for the representation of each client. That the City chose to provide him with a 1099 form, rather than a W–2 form, is merely a factor to be considered, and is by no means controlling.

> [Stomel] performed essentially the same duties for the City for approximately seventeen years; he was not free to choose his own clients on behalf of the City, and he was required to submit written reports detailing his court sessions and duties performed. Under the terms of his contract, he could not be paid until the City Law Department certified that his work was done satisfactorily. According to [Stomel], the municipal court made appointments for indigent persons to meet with him. These facts are indicia of an employer-employee relationship.
>
> [*Id.* at 636–37.]

The record demonstrated that although supervised by the City, Stomel had to exercise independent professional judgment for his clients over which the City would not be expected to have a right to control. That said, Stomel's position was functionally integrated into the City's delivery of municipal services to its citizens. That he performed that role for the City through the means of his private law firm reflected that the task called for independent professional judgment in the representation of each individual indigent client.

Nonetheless, Stomel was still performing that task in fulfillment of a municipal duty on a regular and continuous basis throughout the year. This was not the situation of local firms being handed out cases on an intermittent basis, paid by the day or the hour for the spot work assigned. Rather, Stomel was engaged to fulfill the municipality's public defender function, which was required by the MPDA. In this setting, the means of payment—by contract and not by wages—rightfully was perceived as not dispositive of whether Stomel could pursue his claim as a CEPA employee. *Ibid.* In sum, viewed in light of the *Pukowsky* standard that we discussed in *D'Annunzio*, Stomel has set forth a prima facie case that he is an employee for CEPA purposes. The Appellate Division judgment remanding Stomel's CEPA claim for further proceedings is affirmed.

## IV.

The judgment of the Appellate Division is affirmed in part and reversed in part. The matter is remanded to the Law Division for further proceedings consistent with this opinion.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

In respect of plaintiff Elliot Stomel's claims under 42 *U.S.C.* § 1983 against the City of Camden and its City Council, I concur with both the reasoning and result set forth in parts I and II of the majority's opinion.

However, to the extent the majority, in part III of the majority's opinion, resurrects plaintiff's claims against the City and City Council pursuant to the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8, I respectfully dissent for the reasons set forth in my dissent in *D'Annunzio v. Prudential Insurance Company of America*, 192 *N.J.* 110, 127–37, 927 *A.*2d 113, 123–29 (2007), also decided today.

*For reversal in Part II*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*For affirmance in Part III*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS—6.

*For reversal in Part III*—Justices RIVERA–SOTO—1.