SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

### Fraternal Order of Police, Newark Lodge No. 12 v. City of Newark
(A-15-19) (083197)

**Argued April 27, 2020 -- Decided August 19, 2020**

**LaVECCHIA, J., writing for the Court.**

This appeal involves a challenge to the City of Newark's authority to create by ordinance a civilian oversight board to provide a greater role for civilian participation in the review of police internal investigations and in the resolution of civilian complaints.

Municipal Ordinance 6PSF-B (Ordinance) establishes the Civilian Complaint Review Board (CCRB or the Board), within the Office of the Mayor, to address complaints filed by citizens against the Newark Police Department and its members. The Ordinance authorizes the Board to recommend to the Public Safety Director the discipline to be imposed on individual officers. The Board's powers and responsibilities can be divided into two categories: investigative powers and policy responsibilities.

With respect to its investigative powers, the Ordinance endows the Board with subpoena power and concurrent jurisdiction with the Newark Police Department to receive and investigate complaints against the Department's members. The Board's findings of fact in its investigations are, "absent clear error," made binding on Newark's Public Safety Director, who retains final authority over discipline of the police force. The Board is also allowed to recommend the discipline to be imposed. The Ordinance confers on the Board the added power -- at the conclusion of the Newark Police Department's own investigation into an officer's behavior -- to review the findings, conclusions, and recommendations that ensue from that internal investigation.

In its policymaking capacity, the Board can recommend to city officials procedures for investigating police conduct. The Board is also tasked with a consultative role in the development of a discipline matrix by the Public Safety Director and the affected bargaining units. Further, the Ordinance directs that Newark's Division of Police and Department of Public Safety cooperate with the CCRB. Finally, the Ordinance establishes rules and procedures for the CCRB, one of which provides for the confidentiality of complainant identities. However, "[i]f the complaint is substantiated and is referred to a CCRB hearing, the complainant's identity may be released in the course of any public hearing about the alleged misconduct."

1

The Fraternal Order of Police, Newark Lodge No. 12 (FOP) filed a complaint claiming that the Ordinance was unlawful. Based on the record and arguments presented on cross-motions for summary judgment, the court held the Ordinance invalid and enjoined its operation in virtually all respects. The court left intact, however, the Ordinance's grant of authority to the CCRB to conduct general oversight functions, including aiding in the development of a disciplinary matrix for use by the police force.

The Appellate Division affirmed in part and reversed in part, and sustained the Ordinance as modified. 459 N.J. Super. 458, 471 (App. Div. 2019). First, the court invalidated the Ordinance's required treatment of the CCRB's investigatory findings, determining that the binding nature of the CCRB's findings, absent clear error, impermissibly "makes the CCRB's factual findings paramount to the findings of the IA department." Id. at 491-92. Second, the Appellate Division held that, facially, the Ordinance's procedures for the CCRB do not violate due process, id. at 494, and left to another day an as-applied due process challenge, id. at 495. Third, the Appellate Division rejected FOP's argument "that preemption principles invalidate the Ordinance on its face," but did invalidate the Ordinance's provision authorizing disclosure of a complainant's identity. Id. at 502, 507. Finally, on the issue of subpoena power, the Appellate Division reversed the trial court. Id. at 508.

The Court granted certification, 240 N.J. 7 (2019), and considers the Ordinance as modified by the Appellate Division.

**HELD:** The Ordinance is sustained subject to the Court's further modifications to comply with current legislative enactments. The Court concludes that state law permits the creation by ordinance of this civilian board with its overall beneficial oversight purpose. The Court holds that this review board can investigate citizen complaints alleging police misconduct, and those investigations may result in recommendations to the Public Safety Director for the pursuit of discipline against a police officer. In addition, the review board may conduct its oversight function by reviewing the overall operation of the police force, including the performance of its IA function in its totality or its pattern of conduct, and provide the called-for periodic reports to the officials and entities as prescribed by municipal ordinance. However, to the extent some investigatory powers that the City wishes to confer on its oversight board conflict with existing state law, the Court modifies the Appellate Division's judgment. The board cannot exercise its investigatory powers when a concurrent investigation is conducted by the Newark Police Department's IA unit. An investigation by the IA unit is a function carefully regulated by law, and such an investigation must operate under the statutory supervision of the police chief and comply with procedures established by Newark's Public Safety Director and the mandatory guidelines established by the Attorney General. Concurrent investigations would interfere with the police chief's statutory responsibility over the IA function, and the review board's separate investigatory proceedings would be in conflict with specific

2

requirements imposed on IA investigations and their results. The Court also invalidates the conferral of subpoena power on this review board.

1. The question presented here is whether Newark has the power to legislate, by ordinance, the creation of a citizen oversight board to have a role in the review of the handling of citizens' police misconduct complaints. Municipalities in New Jersey have the power to act legislatively where such authority has been delegated by the Legislature. The three-part test set forth in <u>Dome Realty, Inc. v. City of Paterson</u>, 83 N.J. 212, 225-26 (1980), applies when determining the validity of challenged municipal action. (pp. 20-23)

2. The threshold issue -- whether Newark has the power to create a citizen oversight board to be involved in the review of police misconduct complaints -- implicates N.J.S.A. 40:48-2, the police powers statute, which provides in part that a municipality may make such ordinances not contrary to state or federal law "as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants"; N.J.S.A. 40A:14-118, which authorizes municipalities to establish and "provide for the maintenance, regulation and control" of a police force as part of the executive function of local government and further authorizes the appointment of a chief of police with statutorily designated responsibilities; and N.J.S.A. 40A:14-181, which directs locally created law enforcement agencies to adopt procedures for the investigation of complaints of police misconduct consistent with guidelines issued by the State's chief law enforcement officer: the Attorney General. The Court analyzes each statute. In applying the three-part test set forth in <u>Dome Realty</u> to determine the validity of the municipal action challenged in this case, the Court finds the first and second prongs are not the significant issues: there is no constitutional impediment to municipal action that is claimed here, and the broad police powers statute presents legislatively delegated authority to permit municipalities to create an oversight board. Whether the City can create a citizen oversight board at all, and whether it can do so in the form it has enacted, arises under the third prong of the test: "whether any delegation of power to municipalities has been preempted by other State statutes dealing with the same subject matter." <u>See</u> 83 N.J. at 225-26. (pp. 23-36)

3. The Court analyzes N.J.S.A. 40A:14-118 and, in particular, its final paragraph. The first sentence of that paragraph preserves the governing body's authority to appoint committees "to conduct investigations of the operation of the police force." The next sentence preserves for "the appropriate authority" certain other functions, including "examining at any time the operations of the police force or the performance of any officer or member thereof." The Court concludes that the power identified in the second sentence of the last paragraph of section 118 cannot be aggregated to the CCRB. Under Newark's municipal code, the City has designated the Public Safety Director as the "appropriate authority" for section 118 purposes, with ultimate responsibility for the

3

police force's efficiency and day-to-day operations, including discipline, and the official to whom the police chief reports. There cannot be another entity performing the responsibilities assigned to the appropriate authority under section 118. The Court's interpretation relies on both the language and the history of that statute. (pp. 24-32)

4. The Court also reviews the authority of the Attorney General to provide direction to law enforcement at the local level, which the Attorney General exercised in issuing the Internal Affairs Policy & Procedures (IAPP) to establish uniform procedures for investigating complaints of police misconduct. The Court concludes that section 181 effectively made the AG's IAPP required policy for all municipal law enforcement agencies in New Jersey. (pp. 32-34)

5. The Court construes neither section 118 nor section 181 to preempt the creation of a civilian oversight board in general. But the Court must also consider whether the investigatory or general oversight responsibilities the challenged Ordinance confers upon the CCRB conflict with those statutes. (pp. 37-38)

6. The Court first reviews the investigative functions conferred upon the CCRB. The Court concludes that when no IA investigation is undertaken, the investigatory power conferred on the CCRB by ordinance is valid and poses no conflict with existing statutory law when it is used to investigate a citizen complaint filed with it. And the Court perceives no conflict if the Public Safety Director directs the chief to initiate charges against a police officer after receiving the findings and recommendation of the CCRB, notwithstanding that the IA process was not commenced. However, under present law, the IA process must remain a self-contained, confidential process as designed with respect to the personnel selected and trained to perform such investigations, responsive to the chief who has ultimate responsibility for the IA operation, and separated on a reporting basis from others on the force. The process and the information gathered in such investigations is subject to strict confidentiality requirements, as currently mandated by the IAPP, with which local law enforcement agencies are compelled by section 181 to comply. Under the IAPP, section 181, and section 118, there simply cannot be a concurrent investigation of a citizen's police complaint by a CCRB while an IA complaint is under review. For that to be permissible, present statutes would have to be altered to clearly indicate how the two systems could work compatibly or to indicate that the present insulating features of the IA investigatory process no longer enjoy paramountcy. The Court accordingly holds that the CCRB's authority to conduct concurrent investigations is invalid. (pp. 38-46)

7. Turning to the CCRB's oversight functions, the Court agrees with the Appellate Division, which upheld the Board's roles in creating a disciplinary matrix to be used by the Public Safety Director and conducting oversight reviews and reporting periodically to the Public Safety Director and to the Council. That power, preserved in the first sentence of the last paragraph of section 118, pertains to review of an overall operation of the

4

police force or, as here, the IA unit's overall operational results, and does not include the ability to review and critique the handling of an individual IA investigation into alleged police misconduct. (pp. 46-48)

8. As to subpoena power, the Council's conferral through this Ordinance of subpoena power on the CCRB cannot be squared with existing statutes. There is no inherent authority for the Council to delegate its subpoena power to a non-legislative body of its creation. To the extent that the Council itself has subpoena power, that power is inherent in and tied to the power to legislate. While a municipal governing body can delegate its own subpoena power to a subcommittee of its members in furtherance of a proper legislative purpose, the first sentence of the last paragraph in section 118 stops far short of supporting that a municipality now has the power to confer subpoena power on any public-member commission it chooses to create. To the extent this CCRB exercises its oversight function, consistent with section 118, the referenced "power[] of inquiry" is not equivalent to "subpoena power." The Legislature would have to act in order for the City to have the ability to confer subpoena power on its CCRB. Nonetheless, the Council retains its own power to issue subpoenas and may be motivated to exercise that power as a result of an oversight report from the CCRB about the performance of the IA function in Newark, viewed in its totality, as the Ordinance calls for. (pp. 48-51)

9. The Court finds FOP's due process challenge premature but notes that the statutory protections trigger if and when the Public Safety Director chooses to impose discipline and that, because the CCRB is not an adjudicative body, traditional notions of due process may not arise in the CCRB's purely investigative setting. (pp. 51-52)

**The Court MODIFIES the judgment of the Appellate Division, AFFIRMING IN PART and REVERSING IN PART. The Ordinance, as modified by the Court's opinion, is SUSTAINED.**

**CHIEF JUSTICE RABNER, dissenting,** believes the Newark City Council chose a valid course when it passed the Ordinance, as modified by the Appellate Division. In Chief Justice Rabner's view, the legislative scheme directly anticipates the delegation of subpoena power to oversight boards in N.J.S.A. 40A:14-118; the "necessary and proper" clause of N.J.S.A. 40:48-2 offers further authority for the Council's action; and N.J.S.A. 40A:14-181 does not empower the Attorney General to override the authority the Legislature granted municipalities and civilian review boards to investigate the operation of local police forces under section 118. Chief Justice Rabner would uphold the Ordinance, which would allow Newark's CCRB to conduct investigations similar to other civilian oversight boards throughout the nation.

**JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion. CHIEF JUSTICE RABNER filed a dissent.**

SUPREME COURT OF NEW JERSEY
A-15 September Term 2019
083197

Fraternal Order of Police,
Newark Lodge No. 12,

Plaintiff-Appellant,

v.

City of Newark,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
459 N.J. Super. 458 (App. Div. 2019).

| Argued | Decided |
|--------|---------|
| April 27, 2020 | August 19, 2020 |

Matthew D. Areman argued the cause for appellant
(Markowitz & Richman, attorneys; Matthew D.
Areman, of counsel and on the briefs).

Avion M. Benjamin, First Assistant Corporation
Counsel, argued the cause for respondent (Kenyatta K.
Stewart, Corporation Counsel, attorneys; Avion M.
Benjamin, of counsel and on the briefs).

Daniel I. Bornstein, Assistant Attorney General,
argued the cause for amicus curiae Attorney General
of New Jersey (Gurbir S. Grewal, Attorney General,
attorney; Daniel I. Bornstein, of counsel and on the
briefs).

Vito A. Gagliardi, Jr., argued the cause for amicus curiae New Jersey State Association of Chiefs of Police (Porzio, Bromberg & Newman, attorneys; Vito A. Gagliardi, Jr., of counsel and on the brief, and David L. Disler, on the brief).

Lawrence S. Lustberg argued the cause for amici curiae American Civil Liberties Union of New Jersey and Newark Communities for Accountable Policing (Gibbons and American Civil Liberties Union of New Jersey Foundation, attorneys; Lawrence S. Lustberg, Michael R. Noveck, Jeanne LoCicero, and Alexander Shalom, on the briefs).

CJ Griffin submitted a brief on behalf of amici curiae New Jersey Urban Mayors Association, Latino Leadership Alliance of New Jersey, and Libertarians for Transparent Government (Pashman Stein Walder Hayden, attorneys; CJ Griffin, on the brief).

Alexis Karteron submitted a brief on behalf of amici curiae Urban League of Essex County and Junius Williams, Esquire (Rutgers Law School Constitutional Rights Clinic, attorneys; Alexis Karteron, on the brief).

JUSTICE LaVECCHIA delivered the opinion of the Court.

This appeal involves a challenge to the City of Newark's (the City or Newark) authority to create by ordinance a civilian oversight board to provide a greater role for civilian participation in the review of police internal investigations and in the resolution of civilian complaints. Newark was the first municipality in this state to join others across the nation that have created

2

a civilian oversight or review entity to increase police accountability and create stronger relationships between the community and the police. No two civilian oversight or review entities are alike in their genesis, their roles, or the legal landscape in which they arose and are controlled.

This challenge to Newark's civilian oversight entity must be considered in the context of the landscape here in New Jersey. We conclude that state law permits the creation by ordinance of this civilian board with its overall beneficial oversight purpose. Such boards must operate consistently with current statutes, however. To the extent some investigatory powers that the City wishes to confer on its oversight board conflict with existing state law, we are compelled to modify the Appellate Division's judgment. We also invalidate the conferral of subpoena power on this review board. The civilian review board's powers must comply with current legislative enactments unless the Legislature refines the law to specifically authorize certain functions that Newark intends to confer on its review board.

We hold that this civilian review board can investigate citizen complaints alleging police misconduct, and those investigations may result in recommendations to the Public Safety Director for the pursuit of discipline against a police officer. However, the board cannot exercise its investigatory powers when a concurrent investigation is conducted by the Newark Police

3

Department's Internal Affairs (IA) unit.  An investigation by the IA unit is a function carefully regulated by law, and such an investigation must operate under the statutory supervision of the police chief and comply with procedures established by Newark's Public Safety Director and the mandatory guidelines established by the Attorney General.  We conclude that concurrent investigations would interfere with the police chief's statutory responsibility over the IA function and that the review board's separate investigatory proceedings would be in conflict with specific requirements imposed on IA investigations and their results.

Where there is no existing IA investigation, the review board may conduct investigations in its own right.  In addition, the review board may conduct its oversight function by reviewing the overall operation of the police force, including the performance of its IA function in its totality or its pattern of conduct, and provide the called-for periodic reports to the officials and entities as prescribed by municipal ordinance.

Thus, the Ordinance, as modified by this opinion, is sustained.  We modify the judgment of the Appellate Division, affirming in part and reversing in part the conclusions reached.

I.

A.

We begin with some general background on civilian oversight entities to place in context the action taken by Newark.

There exists an ever-growing body of scholarship on the development of civilian review or oversight entities. In the concise description provided through the American Bar Association, a citizen review board may fairly be understood as typically operating as "an agency independent of the police department with responsibility for receiving and investigating citizen complaints" of police conduct. Samuel Walker, The Citizen Review Board Model, in Citizen Oversight of Law Enforcement (Justina Cintron Perino ed., 2006). The establishment of such entities generally has derived from the view that the police IA function is not producing fair and thorough investigations. Ibid. Thus, a civilian review board usually functions as an alternative to investigations conducted by IA units of police departments. Ibid.

However, there exists a broad array of forms and structures for civilian oversight, a term used more broadly to capture that variety. Sharon R. Fairley, Survey Says?: U.S. Cities Double Down on Civilian Oversight of Police Despite Challenges and Controversy, 20 Cardozo L. Rev. de novo 1, 5 (2020) ("In the nearly eighty years since the first civilian entity was formed to address

police accountability, the concept of civilian oversight has been broadly recognized as a way for community interests to independently check police conduct.").  Oversight entities have been categorized, based on a recent survey of the existing forms, as having some or all of the following oversight functions:  investigative (review police incidents independently from the police department's investigation); review (review or monitor police investigations of police incidents); audit (audit a sampling of investigations rather than reviewing each one, or all within a certain category of event); adjudicative (conduct the disciplinary hearing or proceeding and make findings and conclusions); appellate review (review outcomes of disciplinary investigations at request of complainant or accused officer); supervisory (make policy and strategic decisions regarding police department operations); and advisory (make recommendations to the police department concerning high-level policy and operational strategies).  Id. at 8.  Those categories are described as not mutually exclusive.  Ibid.

The first formal civilian oversight entity in the United States was created in the 1940s, but with more recent social change civilian oversight of police departments has proliferated:  Twenty-two civilian oversight entities have been created since 2014, including the board created by Newark.  Id. at 3-4, 14.  A recent survey of the one hundred most populous cities in the nation found that

sixty-one have some form of civilian oversight.  Id. at 6, 9 (describing such oversight as having become "a normative element within the police accountability infrastructure").  Many of those entities (38%) review or monitor investigations conducted by the police department, while some entities (21%) conduct independent investigations of police incidents.  Id. at 8-9.

That said, examination of "the broad array of models and systems nationwide" revealed that "no two are alike."  Id. at 5.  And, as noted, each civilian oversight entity's structure and function must be considered from the perspective of the legal framework of the state in which it operates.  In general, though, civilian oversight boards serve to foster public trust, police accountability, and transparency in the review of police conduct.

B.

On March 17, 2016, Newark adopted Municipal Ordinance 6PSF-B (Ordinance), establishing the Civilian Complaint Review Board (CCRB or the Board) -- the Ordinance and CCRB at issue here.  The background to that follows.

Almost a decade ago, in May 2011, the United States Department of Justice, Civil Rights Division (DOJ) began an investigation into the Newark Police Department (Department) after receiving complaints of civil rights

7

violations by the Department, including complaints about excessive force, unwarranted stops and arrests, and discriminatory police action.

After a three-year investigation, the DOJ issued a report on July 22, 2014, detailing its finding that the Newark Police Department engaged in a pattern or practice of constitutional violations. In relevant part, the DOJ also found deficiencies in the Newark Police Department's systems "designed to prevent and detect misconduct," specifically mentioning as deficient the Department's methods for "reviewing force and investigating complaints regarding officer conduct." According to the Department's own records, IA "sustained only one excessive force allegation in the six-year period from 2007 through 2012."[1]

The day that the DOJ issued its report, the City and the DOJ executed "an Agreement in Principle, which contemplate[d] the negotiation of a Consent

---

[1] By way of contrast, "a 2006 Bureau of Justice Statistics Special Report found that large municipal police departments sustained an average of 8% of citizens' complaints about police use of force." (citing Bureau of Justice, Statistics Special Report: Citizen Complaints about Police Use of Force, June 2006.)

Decree with the DOJ to resolve [its] investigation of the Newark Police Department."[2]

On March 3, 2016, the DOJ filed a complaint against the City in federal court seeking declaratory or equitable relief to remedy the conduct by the Newark Police Department "that has deprived persons of rights, privileges, and immunities secured and protected by the Constitution and laws of the United States."

Two weeks later, the Newark Municipal Council passed the Ordinance involved in this appeal.

On April 20, 2016, the DOJ and the City entered into a Consent Decree which, among other things, stipulated to enhanced community engagement and

---

[2]  As reiterated later in the Ordinance itself, the July 2014 Agreement in Principle stated that

> [t]he City is establishing and will fund a civilian oversight entity for the [Newark Police Department] to assist [the Newark Police Department] both in adhering to the Agreement and to foster positive relations between [the Newark Police Department] and the Newark Community.  The City will establish a mechanism through which it will work with the community to determine the appropriate form and scope of oversight, within the parameters set forth in the Agreement.  The Independent Monitor of the Agreement will evaluate and report on the City's establishment and ongoing implementation of a civilian oversight entity.

civilian oversight.[3]  In pertinent part, the Decree ordered the Newark Police Department to "engage constructively with the community to promote and strengthen partnerships and to achieve collaborative, ethical, and bias-free policing."  And, "[a]s part of this effort," the City agreed to "establish a civilian oversight entity to enhance [the Newark Police Department's] accountability and transparency and the public's confidence"; however, the decree expressly stated that it "shall not be deemed to confer on the civilian oversight entity any powers beyond those permitted by law, including by civil service rules and collective bargaining agreements."[4]

---

[3]  The Consent Decree called for review and revision of Newark Police Department policy; training; guidance on effectuating future stops, searches, and arrests; bias-free policing; use of force policies; in-car and body-worn cameras; complaint intake and internal investigation procedures; compliance reviews and integrity audits; discipline policies; data systems improvement; and transparency and oversight.  By our attention in this opinion to the reference to a civilian oversight entity in the Consent Decree, we do not imply that the Consent Decree's sole or predominant focus was the imposition of a civilian oversight entity.

[4]  The Consent Decree order provided that

> [w]ithin 365 days of the Operational Date, the City shall implement and maintain a civilian oversight entity.  The duties and responsibilities of that entity shall, at a minimum, include the substantive and independent review of internal investigations and the procedures for resolution of civilian complaints; monitoring trends in complaints, findings of misconduct, and the imposition of discipline; and reviewing and recommending changes to [the Newark

C.

The Ordinance, passed prior to but in clear contemplation of the Consent Decree, establishes, within the Office of the Mayor, a CCRB to address complaints filed by citizens against the Newark Police Department and its members. The Ordinance further authorizes the Board to recommend to the Public Safety Director the discipline to be imposed on individual officers.

In its opinion in this matter, the Appellate Division included a detailed description of the Ordinance at issue. See Fraternal Order of Police, Newark Lodge No. 12 v. City of Newark, 459 N.J. Super. 458, 475-81 (App. Div. 2019). We briefly review several components important to this appeal and provide further detail later.

Section I of the Ordinance sets out the creation and structure of the CCRB. The Board is to be comprised of eleven members, all appointed by the Mayor with the advice and consent of the Municipal Council. Four of the appointees are the City's Inspector General, and three members of the Municipal Council or designees nominated by the Council. The remaining

---

Police Department's] policies and practices, including, but not limited to, those regarding use of force, stop, search, and arrest. The Monitor will evaluate and report on the City's implementation and maintenance of this civilian oversight entity to determine if it is helping to achieve the goals of this Agreement.

11

seven are to be selected by the Mayor from individuals recommended by specifically designated community and advocacy organizations. The Ordinance also provides that the Board and its operations will be supported though municipal funds (Section II).

The Board's powers and responsibilities, delineated in Section III, can, for ease of reference, be divided into two categories: investigative powers and policy responsibilities.

With respect to its investigative powers, the Ordinance endows the Board with subpoena power and concurrent jurisdiction with the Newark Police Department to receive and investigate complaints against the Department's members.[5] The Board's findings of fact in its investigations are, "absent clear error," made binding on Newark's Public Safety Director, who retains final authority over discipline of the police force. The Board is also allowed to recommend the discipline to be imposed.

---

[5] Section IV of the Ordinance provides that

> [t]he processing and review of civilian complaints shall not be deferred because of any pending or parallel disciplinary proceeding or criminal investigation unless such request for deferment is made by the office of a county prosecutor or a state or federal law enforcement agency or prosecutor or by a court order.

12

The Ordinance confers on the Board the added power -- at the conclusion of the Newark Police Department's own investigation into an officer's behavior -- to review the findings, conclusions, and recommendations that ensue from the departmental internal investigation. In this latter respect, the Board's findings are to be submitted to the Public Safety Director, and semi-annually, the Board is to prepare and submit a report on such "Investigation Reviews" to the Public Safety Director, Mayor, and Council.

In its policymaking capacity, the Board can recommend to city officials procedures for investigating police conduct. The Board is also tasked with a consultative role in the development of a discipline matrix by the Public Safety Director and the affected bargaining units.[6]

Further, the Ordinance directs that Newark's Division of Police and Department of Public Safety cooperate with the CCRB (Section IV), requiring those entities

> to provide such assistance as the Board may reasonably request, to cooperate fully with investigations by the Board, and to provide to the Board upon request records and other materials which are necessary for the investigation of complaints submitted pursuant to this

---

[6] The Ordinance provides that "[t]he discipline matrix and guidelines should be developed by the Public Safety Director and affected bargaining units, in consultation with the CCRB, and must accord with any Consent Order or Judgment with the United States Department of Justice."

13

section, except such records or materials that cannot be disclosed by law.

However, the Ordinance further provides that

> [t]he provisions of this Ordinance shall not be construed to limit or impair the authority of the Public Safety Director to discipline members of the [Newark Police Department] nor obviate the responsibility of the [Newark Police Department] to investigate citizen complaints or incidents to which [the Newark Police Department] is made known . . . . Nor shall the provisions of this section be construed to limit the rights of members of the [Newark Police Department] with respect to disciplinary action, including, but not limited to, the right to notice and a hearing, which may be established by any provision of law or otherwise.

Finally, Section V of the Ordinance establishes rules and procedures for the CCRB, one of which provides for the confidentiality of complainant identities. However, "[i]f the complaint is substantiated and is referred to a CCRB hearing, the complainant's identity may be released in the course of any public hearing about the alleged misconduct." Section V reiterates that the Public Safety Director retains final authority and discretion over disciplinary determinations.

14

II.

A.

On August 5, 2016, the Fraternal Order of Police, Newark Lodge No. 12 (FOP)[7] filed a verified complaint in Superior Court, claiming that the Ordinance was unlawful[8] and seeking relief related to the Ordinance's effect on "the administration of discipline among Newark's police officers." FOP asked the court to enjoin enforcement of the Ordinance and to declare it void ab initio.

Based on the record and arguments presented on cross-motions for summary judgment, the court held the Ordinance invalid and enjoined its operation in virtually all respects.

The court determined that the Ordinance fundamentally conflicted with N.J.S.A. 40A:14-118 (the police force statute) because it inappropriately authorized the CCRB to "file a complaint against an officer and conduct the investigation," which is a power reserved to the police chief as part of his statutory responsibility for management of day-to-day operations. And,

---

[7] FOP "is the certified, exclusive collective bargaining representative of police officers employed by the City of Newark."

[8] Specifically, FOP alleged that the ordinance violated N.J.S.A. 40:48-25; N.J.S.A. 40:69A-36; N.J.S.A. 40A:14-181; N.J.S.A. 40A:14-118; N.J.S.A. 40A:14-147; N.J.S.A. 11A:2-13; and Article 1, Paragraph 1 of the New Jersey Constitution.

15

because the City Council has no power to investigate such complaints, the court determined that the Council cannot by Ordinance "transfer th[at] power to the CCRB."

The court observed that the Ordinance's allowance of concurrent investigations would interfere with those conducted by the police chief's designated IA unit and, further, that the Ordinance conflicts with the Attorney General Internal Affairs Policy & Procedures (IAPP or AG Guidelines) by allowing separate CCRB investigations that would undermine the uniformity of IA investigations. The court found that the AG Guidelines, which preempt in the conducting of such investigations, require an experienced investigator and strict confidentiality, none of which is assured under the CCRB's process. The court questioned the neutrality of the CCRB due to the composition of its membership and noted that "the CCRB is empowered both to investigate and hear matters," which the court viewed as "separate functions" "antithetical to each other." Finally, the court also found no authority to support a municipality's grant of subpoena power to a civilian review board.

Although invalidating the Ordinance's conferral of investigatory functions on the CCRB, the court left intact the Ordinance's grant of authority to the CCRB to conduct general oversight functions, including aiding in the development of a disciplinary matrix for use by the police force.

B.

An appeal by the City followed, in which the Appellate Division affirmed in part and reversed in part. Fraternal Order of Police, 459 N.J. Super. at 471. The Appellate Division modified the Ordinance and determined that, with those modifications, the Ordinance is consistent with N.J.S.A. 40A:14-118.

First, the court invalidated the Ordinance's required treatment of the CCRB's investigatory findings. The court explained that "the Ordinance interferes with the Chief's statutory rights by making the CCRB's findings of fact binding, absent clear error." Id. at 483. The court noted that "the Chief's day-to-day routine operations of the force include supervising the IA Department, through the chain of command, administering the disciplinary process, and imposing any resulting discipline." Id. at 491. Thus, the binding nature of the CCRB's findings, absent clear error, could not survive under the court's analysis because that required treatment impermissibly "makes the CCRB's factual findings paramount to the findings of the IA department," thereby undermining the chief's authority over the day-to-day operation of the police force "by rendering the results of the IA Department's investigation nugatory and commandeering the disciplinary process." Id. at 491-92.

Second, the Appellate Division held that, facially, the Ordinance's procedures for the CCRB do not violate due process, id. at 494, and left to another day an as-applied due process challenge, finding that to be premature, id. at 495. In particular, the court saw no facial due process violation in the requirement that the Public Safety Director explain any disagreement with a CCRB recommendation in an individual case of discipline because the CCRB does not adjudicate cases, operates only as an "investigatory and oversight body," and "has no authority to discipline officers." Id. at 496.

Third, the Appellate Division rejected FOP's argument "that preemption principles invalidate the Ordinance on its face, because N.J.S.A. 40A:14-181 and the AG Guidelines apply to law enforcement agencies and do not address a board like the CCRB." Id. at 502. Further, applying the preemption factors, the court (1) did "not read N.J.S.A. 40A:14-181 or the AG Guidelines as providing the exclusive means for the investigation of civilian complaints," (2) did not view uniformity in the conclusions reached by the separate investigations as necessary because, ultimately, discipline authority remained reposed with the Public Safety Director, and (3) did not find the "state scheme" to be "so pervasive or comprehensive" as to preclude municipal regulation that includes civilian involvement in the investigation of police misconduct. Id. at 504-06. In its preemption analysis, the court did, though,

18

invalidate the Ordinance's provision authorizing disclosure of a complainant's identity, finding that it could thwart other investigations and might discourage complainants from coming forward, disclose an informant, or encourage, for notoriety's sake, unwarranted complaints. Id. at 507.

Finally, on the issue of subpoena power, the Appellate Division reversed the trial court. Id. at 508. The Appellate Division found support for the Council's ability to confer subpoena authority on the CCRB as a "power . . . incidental to the City's policy and express statutory power under N.J.S.A. 40A:14-118 to create a CCRB for the limited purpose of providing oversight in investigating and examining complaints of police misconduct." Ibid.

We granted FOP's petition for certification, which challenged the lawfulness of the Ordinance. 240 N.J. 7 (2019). FOP's petition raises arguments about: (1) whether the Ordinance is consistent with N.J.S.A. 40A:14-118; (2) whether the Ordinance is governed by and consistent with N.J.S.A. 40A:14-181; (3) whether the Ordinance is governed by and consistent with the AG Guidelines; (4) whether the Ordinance lawfully authorizes the CCRB to exercise subpoena power; and (5) whether the Ordinance's procedures for the CCRB interfere with police officers' due process rights.

We granted leave to numerous organizations to appear as amici curiae. The AG appeared as an amicus before the Appellate Division on limited

19

issues, and does so again before this Court. The AG argues that the Ordinance should be held to conflict with section 118 and state law governing IA matters. The Chiefs of Police Association argues similarly and in support of reversal of the Appellate Division judgment. All other amici support the City in urging that the judgment of the Appellate Division be affirmed. Our consideration of the arguments is woven into the analysis of the issues.

## III.

Newark is a municipal government organized under the mayor-council plan of the Faulkner Act.[9] Mun. Council of Newark v. James, 183 N.J. 361, 364 (2005). The Faulkner Act was created to confer great power to local governments consistent with the State Constitution. McCann v. Clerk of Jersey City, 167 N.J. 311, 324, 328 (2001).

The mayor-council plan of the Faulkner Act reflects a traditional separation of executive and legislative power, "vest[ing] in the mayor the responsibility for administrative and executive operations of the municipality, while reposing the ultimate legislative and concomitant investigative responsibilities in the council." James, 183 N.J. at 366. Here, the City exercised legislative authority when enacting an ordinance creating the CCRB.

---

[9] N.J.S.A. 40:69A-1 to -210. The Act is also known as the Optional Municipal Charter Law.

That exercise of municipal legislative authority must find its roots in power delegated to it by the Legislature.

Municipalities in our State have the power to act legislatively where such authority has been delegated by the Legislature. Wagner v. Mayor & Mun. Council of Newark, 24 N.J. 467, 474 (1957) (stating that "[i]t is fundamental in our law that there is no inherent right of local self-government beyond the control of the State"); Fred v. Mayor & Mun. Council of Old Tappan, 10 N.J. 515, 518 (1952) (explaining that municipal power is statutory in origin).

That said, the principle of home rule is legislatively stitched into the fabric of New Jersey government. Inganamort v. Borough of Fort Lee, 62 N.J. 521, 528 (1973) ("Home rule is basic in our government."). That principle finds expression in the legislative choice to invest "the police power of the State . . . in local government to enable local government to discharge its role as an arm or agency of the State and to meet other needs of the community." Ibid. N.J.S.A. 40:48-2, the police powers statute, provides that

> [a]ny municipality may make, amend, repeal and enforce such other ordinances, regulations, rules and by-laws not contrary to the laws of this state or of the United States, as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants, and as may be necessary to carry into effect

21

> the powers and duties conferred and imposed by this subtitle, or by any law.

Statutes granting powers to municipal governments are entitled, by constitutional provision, to liberal construction, and they include not only expressly conferred powers but also those incidental and "of necessary or fair implication . . . and not inconsistent with or prohibited by [the] Constitution or by law." N.J. Const. art. IV, § 7, ¶ 11 (Paragraph 11). Paragraph 11 is not, however, an independent source of municipal power. Fred, 10 N.J. at 518 (rejecting the contention that Article IV, Section VII, Paragraph 11 of the 1947 Constitution, "which had no counterpart in its predecessor constitution," was itself a grant of general police powers to municipalities); see also Union Cty. Bd. of Chosen Freeholders v. Union Cty. Park Comm'n, 41 N.J. 333, 339 (1964) (further explaining that Paragraph 11 "was intended to obviate earlier judicial decisions which had taken the position that grants of power by the Legislature to its political subdivisions should be construed narrowly and that doubt as to the existence of any asserted power should lead to its denial"). Moreover, the constitutional provision acknowledges the omnipresent brake on the exercise of municipal authority: where municipal power to act exists, municipal action cannot run contrary to statutory or constitutional law.

A three-part test applies when determining the validity of challenged municipal action: (1) "whether the State Constitution prohibits delegation of

municipal power on a particular subject because of the need for uniformity of regulation throughout the State"; (2) "[i]f the Legislature may delegate authority in the area under scrutiny, the second question is whether the Legislature has in fact done so"; and (3) "whether any delegation of power to municipalities has been preempted by other State statutes dealing with the same subject matter." Dome Realty, Inc. v. City of Paterson, 83 N.J. 212, 225-26 (1980); see also Inganamort, 62 N.J. at 527. Because "[a] municipality may not contradict a policy the Legislature establishes," the question usually boils down to "whether, upon a survey of all the interests involved in the subject, it can be said with confidence that the Legislature intended to immobilize the municipalities from dealing with local aspects otherwise within their power to act." Summer v. Township of Teaneck, 53 N.J. 548, 554-55 (1969).

IV.

The threshold issue here is whether the City has the power to legislate, by ordinance, the creation of a citizen oversight board to have a role in the review of the handling of citizens' police misconduct complaints. Whether that question is viewed as an issue of preemption, or a question of fundamental conflict with other statutory policies, it must be resolved before we address the details of this Board's execution of its oversight and involvement with police misconduct complaints.

23

Newark's authority to enact a civilian oversight board involves consideration of the general police power statute, with its broad "necessary and proper" delegation of authority to municipalities, and several related subjects on which the Legislature has spoken. The other key statutes are N.J.S.A. 40A:14-118, which authorizes municipalities to establish and "provide for the maintenance, regulation and control" of a police force as part of the executive function of local government and further authorizes the appointment of a chief of police with statutorily designated responsibilities, and N.J.S.A. 40A:14-181, which directs locally created law enforcement agencies to adopt procedures for the investigation of complaints of police misconduct consistent with guidelines issued by the State's chief law enforcement officer: the Attorney General.

A.

1.

With respect to the creation and operation of a municipal police force, N.J.S.A. 40A:14-118 has multiple components. Several features are important here.

Any police force created by ordinance under this statute's authority must be part of the "executive and enforcement function" of local government, and a specific line of authority relating to the police force is required.

> Any such ordinance shall, in a manner consistent with
> the form of government adopted by the municipality

24

and with general law, provide for a line of authority relating to the police function and for the adoption and promulgation by the appropriate authority of rules and regulations for the government of the force and for the discipline of its members. . . . Any such ordinance, or rules and regulations, shall provide that the chief of police, if such position is established, shall be the head of the police force and that he shall be directly responsible to the appropriate authority for the efficiency and routine day to day operations thereof . . . .

[N.J.S.A. 40A:14-118.]

The statute assigns certain specific tasks to the chief of police, when such a position is created. Ibid. Among the chief's statutory duties is the responsibility to administer and enforce rules and regulations for the discipline of the force pursuant to policies that are to be established by "the appropriate authority." Ibid. The chief is also required to report, at least monthly, to "the appropriate authority" on the operation of the force. Ibid.

The term "appropriate authority" is defined. Its definition underscores a patent legislative intent to ensure that interactions, by other individuals or entities within the local government, with the police force occur through the designated "appropriate authority," whomever or whatever is chosen to perform that function.

As used in this section, "appropriate authority" means the mayor, manager, or such other appropriate executive or administrative officer, such as a full-time director of public safety, or the governing body or any

25

designated committee or member thereof, or any municipal board or commission established by ordinance for such purposes, as shall be provided by ordinance in a manner consistent with the degree of separation of executive and administrative powers from the legislative powers provided for in the charter or form of government either adopted by the municipality or under which the governing body operates.

Except as provided herein, the municipal governing body and individual members thereof shall act in all matters relating to the police function in the municipality as a body, or through the appropriate authority if other than the governing body.

[Ibid.]

Finally, in a closing paragraph comprised of three sentences, the statute first underscores that it does not intend to prevent the governing body from exercising its authority to conduct certain investigations relating to the police force.

Nothing herein contained shall prevent the appointment by the governing body of committees or commissions to conduct investigations of the operation of the police force, and the delegation to such committees or commissions of such powers of inquiry as the governing body deems necessary or to conduct such hearing or investigation authorized by law.

[Ibid. (emphasis added).]

The second sentence preserves for "the appropriate authority," and other executive or administrative personnel, certain other functions.

> Nothing herein contained shall prevent the appropriate authority, or any executive or administrative officer charged with the general administrative responsibilities within the municipality, from <u>examining at any time the operations of the police force or the performance of any officer or member</u> thereof.
>
> [<u>Ibid.</u> (emphasis added).]

The third sentence, irrelevant here, likewise preserves for "the appropriate authority" the power to act "in an emergency situation through special emergency directives." <u>Ibid.</u>

### 2.

We construe section 118 to signal the creation of only one "appropriate authority." The first two sentences of the final paragraph of section 118 relate to a separation of powers between the branches of municipal government and the legislative intent to have one "appropriate authority" designated to buffer the police force from political interference. We reach that interpretation based on the text and legislative history to the modern version of the police force statute. To the extent the City argued that its CCRB constitutes the "appropriate authority" for purposes of this paragraph of section 118, we reject that contention at the outset.

### i.

The final paragraph's first sentence about the governing body's power simply preserves otherwise existing authority and prevents that authority from

being diminished by the other provisions of section 118. Hence, in this setting, it is essentially a reference back to the police powers statute and the authority that it confers.

The second sentence of that paragraph cannot be conflated with the first because it addresses power preserved to "the appropriate authority" and related administrative staff and personnel "charged with general administrative responsibilities within the municipality." The Ordinance cannot aggregate to its CCRB authority reserved under the second sentence. The CCRB cannot become a second "appropriate authority" for purposes of section 118. Under Newark's municipal code, section 2:22-3.3, the City has designated the Public Safety Director as the "appropriate authority" for section 118 purposes, with ultimate responsibility for the police force's efficiency and day-to-day operations, including discipline, and the official to whom the police chief reports. There cannot be another entity performing the responsibilities assigned to the appropriate authority under section 118.

It is clear from the Legislature's choice of language describing the "appropriate authority" and the term's definitional paragraph that there is to be one, and only one, appropriate authority designated within a municipality to perform the roles that section 118 assigns to that designated person or entity.

The plain language of section 118 consistently refers to "the appropriate authority," not multiple appropriate authorities, and the defining provision adds to the certainty that the Legislature intended that there be only one. The term's usage does not permit a reasoned reading that it can mean one person or entity in one place and another person or entity in another. Moreover, the thrust of section 118's plain language supports finding that it is an insulating role that "the appropriate authority" is expected to play for the police force. The appropriate authority performs that insulating role by establishing the rules and regulations that the police force must follow and the police chief must enforce; by being the entity or individual to whom the police chief reports on all day-to-day operations about the force, including the disciplining of officers; and by being the buffer through which contacts are to be made by individual members or the governing body as a whole, unless they are made "the appropriate authority." Those roles do not bespeak a moving target. Rather, the statute suggests one line of authority though a singular entity or person to prevent interference with the running of the police force.

Any doubt about that evaporates when one considers the legislative history to the extensive text that now comprises section 118. Section 118 was substantially amended and expanded in 1981. L. 1981, c. 266. The 1981 amendments sought to balance concerns raised by local officials and police

chiefs.  See Gauntt v. Mayor & Mun. Council of Bridgeton, 194 N.J. Super. 468, 484-85 (App. Div. 1984).  As courts recognized, "[b]y granting chiefs of police express statutory authority, the statute sought to avoid undue interference by a governing body into the operation of the police force." Falcone v. De Furia, 103 N.J. 219, 222 (1986); see also Assemb. Judiciary, Law, Pub. & Def. Comm. Statement to S. 1243 1 (June 22, 1981); S. Cty. & Mun. Gov't Comm. Statement to S. 1243 1 (Nov. 24, 1980).

The committee statements and extensive additions to the former abbreviated version of section 118 support a clear legislative intent to (1) specifically delineate the powers and responsibilities of police chiefs, (2) preserve the separation of powers between the executive and legislative branches of government at the municipal level, (3) designate an "appropriate authority" as a conduit between the governing body and the police force, and (4) prevent elected representatives from exerting political influence on police operations.  Those changes also support that the appropriate authority is a singular person or entity, as designated locally, entrusted by the Legislature to perform the supervisory and insulating role the statute envisions.

ii.

Moreover, the first two sentences in the concluding paragraph of section 118 assign different powers to different people, who perform different roles.

30

The first sentence preserves for the governing body its ability to create "committees or commissions to conduct investigations of the operation of the police force." Different language is used in the second sentence, which preserves the ability of "the appropriate authority, or any executive or administrative officer charged with general administrative responsibilities within the municipality," to examine "operations of the police force or the performance of any officer or member thereof."[10] The persons and entities specified in the first and second sentences do not overlap, and their responsibilities are described differently.

We assume that when the Legislature drafts a statute, it avoids surplusage. Burgos v. State, 222 N.J. 175, 203 (2015). We do not regard the investigation of the operation of the police force to be the same as the second sentence's focus on examination of the operations of the police force or the performance of an officer or member. The words chosen by the Legislature have meaning and each is entitled to receive its plain meaning. Paff v. Galloway Township, 229 N.J. 340, 353 (2017) ("We must presume that the Legislature intended the words that it chose and the plain and ordinary

---

[10] The third sentence of the final paragraph of section 118, which again is not relevant here, further ascribes the power to take emergency action to "the appropriate authority," thus continuing the shift in focus begun in the second sentence.

31

meaning ascribed to those words."). From the different word choices and the history of this text, we glean that the expressly preserved power of the governing body to create committees or commissions is not to be confused as conferring the separate powers that are reposed in the executive bodies identified in the second sentence.

B.

The other relevant statutory consideration concerns the authority of the Attorney General to provide direction to law enforcement at the local level.

The Criminal Justice Act of 1970 (the Act), N.J.S.A. 52:17B-97 to -117, aimed to

> encourage cooperation among law enforcement officers and to provide for the general supervision of criminal justice by the Attorney General as chief law enforcement officer of the State, in order to secure the benefits of a uniform and efficient enforcement of the criminal law and the administration of criminal justice throughout the State.
>
> [N.J.S.A. 52:17B-98.]

The Act, which established the Division of Criminal Justice within the Department of Law and Public Safety and made it subject to the Attorney General's supervision, N.J.S.A. 52:17B-99, gives the Attorney General broad law enforcement authority "relating or pertaining to the enforcement and prosecution of the criminal business of the State and of any county," N.J.S.A.

52:17B-101, and calls for its liberal enforcement to achieve its purposes, N.J.S.A. 52:17B-98. County prosecutors, police officers, and all other law enforcement officers must cooperate with, and aid, the Attorney General in the performance of their respective duties. N.J.S.A. 52:17B-112. The Attorney General is empowered to adopt rules and regulations for the efficiency of the Department of Law and Public Safety's work and administration. N.J.S.A. 52:17B-4(d).

The Attorney General exercised that authority to issue the IAPP in 1991 to establish uniform procedures for investigating complaints of police misconduct.[11] According to the IAPP, every law enforcement agency must establish an IA unit, whose role and functions involve investigating complaints of police misconduct, monitoring and tracking officer behavior for incidents of misconduct, and correcting misconduct when it occurs. The IA unit is intended to be insular, consisting of trained law enforcement personnel who

---

[11] The IAPP, first issued in 1991, was revised in 1992, 2000, 2011, 2014, and 2017. The 2014 version was in effect at the time the Ordinance creating the CCRB was adopted and when this lawsuit was filed. The 2017 alteration was relatively minor and substantively insignificant for purposes of this appeal. All references herein to the IAPP are to the 2017 version that was in effect when the Appellate Division decided its appeal and the Court granted certification in this matter. We note, however, that a substantially revised IAPP was issued by the Attorney General in late 2019 while this matter was pending before this Court. It is addressed separately, and later, in this opinion.

33

are directly responsible to the law enforcement executive or the designated IA supervisor. The Guidelines describe procedures that must be followed to receive, investigate, and resolve complaints of misconduct, including safeguards to protect confidential information and requisite training for persons involved in investigations. Individual law enforcement agencies have some discretion in how to fulfill the IA requirements, but certain policies are mandatory. Among the mandatory provisions are requirements that each agency establish and maintain a confidential process, including an IA records system, which must include an IA index and filing system for all documents and records. There are also specific requirements on managing and securing IA records and training requirements for IA personnel.

In 1996, the Legislature enacted legislation compelling all law enforcement agencies in the state to

> adopt and implement guidelines which shall be consistent with the guidelines governing the "Internal Affairs Policy and Procedures" of the Police Management Manual promulgated by the Police Bureau of the Division of Criminal Justice in the Department of Law and Public Safety, and shall be consistent with any tenure or civil service laws, and shall not supersede any existing contractual agreements.
>
> [N.J.S.A. 40A:14-181.]

Section 181 effectively made the AG's IAPP required policy for all municipal law enforcement agencies in New Jersey.

## C.

## 1.

We now turn to the validity of Newark's Ordinance authorizing a civilian oversight board. In applying the pertinent three-part test, see Dome Realty, 83 N.J. at 225-26, we find the first and second prongs are not the significant issues.

There simply is no constitutional impediment to municipal action that is claimed here, or any we perceive.

And, concerning whether there is legislatively delegated authority to permit municipalities to create an oversight board, we find that authority present in the broad police powers statute. N.J.S.A. 40:48-2's authorization for municipalities to legislate for the general welfare has been held to be its own source of municipal power and not an auxiliary power in aid of other specific grants of authority to act. Inganamort, 62 N.J. at 535-36. In an opening "Whereas" paragraph of the Ordinance, the City cites the need "to create[] protections for the citizenry," a reference to its reservoir of power under N.J.S.A. 40:48-2; no other particular source of authority is cited. Nor is more needed to the extent that the City determined that the creation of a civilian oversight board would benefit the general welfare of the citizens of Newark.

N.J.S.A. 40:48-2 is a broad grant of police powers to municipalities.  Id. at 536.  The Ordinance declares that the creation of a civilian oversight entity is "a critical part" in implementing reforms as part of the Consent Decree and is important for the community at large, considering the woeful track record of results from past IA investigations and the findings of the DOJ.  It advances those aims by "creating protections for the citizenry . . . instilling confidence in the resolution of . . . investigation[s] and providing transparency of the process."  Those salutary reasons support use of the delegated grant of municipal police powers for a legitimate local concern.[12]  With the City's apparent reliance on the police powers delegation from the Legislature, it is clear that the second prong of the three-part test does not raise a concern in this case.

The real issue concerning the City's ability to create a citizen oversight board at all, and whether it can do so in the form it has enacted, arises under the third prong of the test.

2.

With respect to outright preemption, the police force statute, N.J.S.A. 40A:14-118, addresses the creation and structure of a police force in this state.

---

[12]  As noted in Section IV.A.2., we construe section 118 as alluding to already existing municipal power -- it is not itself an independent source of authority.

36

Section 118 makes no mention whatsoever about the existence, or role, for a civilian oversight board. When it was enacted, the Legislature may not have been aware that such entities would come into prominence. But, from section 118's silence, we perceive no express or implied preemption that prevents a community from having a civilian oversight body, as a matter of local choice, to be involved in the review of the operation of the police force generally and, specifically, with respect to the police force's handling of police misconduct complaints. The issue is more fundamentally a question about statutory conflict with the intended powers of this civilian review board, but we conclude that section 118 does not preempt the municipal choice to adopt an ordinance creating a civilian oversight board.

Section 181 addresses law enforcement agencies, which as the Appellate Division noted, this CCRB is not. Fraternal Order of Police, 459 N.J. Super. at 502. However, the Legislature plainly intended that the Attorney General's standards and protocols be followed uniformly by law enforcement agencies like the Newark Police Department when performing IA functions. Nevertheless, that does not foreclose a civilian oversight board, so long as the role and duties of such a board do not conflict or interfere with the administration of the AG Guidelines. We do not perceive that section 181 or the AG Guidelines foreclose a community from adopting a civilian oversight

entity, which is, as noted, not itself a law enforcement entity, but rather an entity that interacts with a law enforcement agency.

In sum, we construe neither section 118 nor section 181 to preempt the creation of a civilian oversight board. However, both statutes figure prominently in a conflict analysis for the Ordinance and CCRB under review.

## V.

### A.

The Ordinance gives the CCRB investigatory powers and certain general oversight responsibilities. We address investigatory powers first.

#### 1.

The CCRB's investigatory authority includes the ability to accept and investigate, hear, make findings, and recommend action upon complaints by members of the public, including other police personnel, that allege misconduct involving inappropriate behavior or actions by uniformed and sworn police personnel. Its jurisdiction is concurrent with that of the Newark Police Department's ability to pursue IA investigations.[13]

The CCRB's findings and recommendations are presented to the Public Safety Director, who is the appropriate authority under section 118 and whose

---

[13] There is an exception for requests for deferment by a county prosecutor or state or federal law enforcement, or by court order.

authority over discipline is specifically acknowledged in the Ordinance. The Appellate Division culled from the Ordinance the obligation of the Public Safety Director to accept the CCRB's findings of fact as binding (except for clear error), so that is no longer a part of the Ordinance as it is presented in this appeal to us. See Fraternal Order of Police, 459 N.J. Super at 491-92. The Appellate Division also invalidated the Ordinance's provision that allowed disclosure of a complainant's identity. Id. at 507. The investigatory powers of the Board, including its ability to conduct investigations concurrently with the Newark Police Department's IA investigation, otherwise were left intact.

Newark thus designed its civilian review board to perform its own investigation of citizen complaints, whether or not there is also an IA investigation addressing the same police conduct. And the Ordinance grants the CCRB certain review authority over the results of the police department's IA process. Provisions require that the CCRB be given prior written notification detailing the Public Safety Director' reasons for imposing discipline of a lower level than that recommended by the Board when the Director intends to do so, and the Board may request that the Director appear and answer questions from the Board or provide further explanation. The Director's cooperation with the Board is required. See Section IV of the Ordinance.

2.

We find the prospect of concurrent investigations by the CCRB and the Newark Police Department's IA unit to create a conflict between the Ordinance and statutory policies. That conflict requires some further modification of the Ordinance in order to reconcile it with present law.

The statutes governing the police force and requiring implementation of the AG Guidelines, together, create an IA function that is, in the aspects discussed, rigidly regulated. Section 181 evinces a clear intent that the Attorney General's protocols for conducting IA bring uniformity to IA investigation practices. That intention dovetails with section 118, the police force statute, with its structured line of authority and statutory delegation to the chief to be responsible for the day-to-day operations of the police force. The chief's statutorily assigned duties include responsibility for administration of discipline to individual members of the force pursuant to published procedures established by the person or entity designated as the appropriate authority under section 118. Those procedures also must be consistent with the IA investigatory requirements imposed through the AG Guidelines.

The Legislature, when requiring all local law enforcement agencies to adopt the Attorney General's IAPP, had to have been cognizant of the IAPP's patent intent to professionalize IA investigatory activities and strictly preserve

the confidentiality of the IA process for reasons that the Attorney General has explained. In argument to this Court, the Attorney General emphasizes the premium placed on confidentiality during the investigatory process, finding it necessary to encourage and protect those who come forward with complaints or evidence of police misconduct or problematic behavior. FOP and the Chiefs of Police Association also strongly argue that point. Although that policy is not ours to determine, those guiding principles have been plain on the face of the IAPP since its first iteration.

The Attorney General's protocols allow for careful factual development and protective procedures designed to ensure confidentiality of information collected and thus to encourage people to come forward and cooperate, sure of that confidentiality. See Internal Affairs Policy & Procedures at 42 (providing for the confidentiality of "[t]he nature and course of internal allegations, the progress of internal affairs investigations, and the resulting materials," and setting forth four limited circumstances in which those confidential materials may be released). It is a key feature insisted upon in the AG Guidelines. And the Legislature has required law enforcement agencies, including the Newark Police Department and the chief of police charged with responsibility for this function, to implement it as the Attorney General has directed. N.J.S.A. 40A:14-181. There is no flexibility on that point.

Thus, under present law, the IA process must remain a self-contained, confidential process as designed with respect to the personnel selected and trained to perform such investigations, responsive to the chief who has ultimate responsibility for the IA operation, and separated on a reporting basis from others on the force.  See Internal Affairs Policy & Procedures at 12-13 (noting, among other things, that every law enforcement agency must create a separate IA unit "directly responsible to the law enforcement executive or the designated internal affairs supervisor," that the "[i]nternal affairs investigators should be trained not only in the elements of criminal law, court procedures, rules of evidence and use of technical equipment, but also in the disciplinary and administrative law process" and that "[l]aw enforcement executives shall not assign to the internal affairs unit any person responsible for representing members of a collective bargaining unit").  The process and the information gathered in such investigations is subject to strict confidentiality requirements, as currently mandated by the AG Guidelines, with which local law enforcement agencies are compelled by section 181 to comply.  Internal Affairs Policy & Procedures at 42.  To the extent that the Attorney General

maintains that mandate, no creation of a municipality can interfere with the IA function as it is required to operate.[14]

The prospect of a concurrent investigation by the CCRB, while an IA investigation is underway, interferes with the intended purpose of section 181's and the IAPP's requirements. The IA investigatory process is disrupted, the police chief's authority over the IA function and its proper operation diminished, and the carefully preserved structure of the IA unit responsible to the chief of police is breached by allowing a concurrent investigation by the CCRB with required departmental disclosure of IA investigatory information to the CCRB for use in its own investigation.

Despite the sound intentions to address municipal and community concerns in Newark, which concerns are empirically supported by the DOJ investigation and Consent Decree, the CCRB's operation, as originally codified in the Ordinance, must bend to the legislative infrastructure within which such entities must operate under present law. Under the IAPP, section

---

[14] We acknowledge that, after certification was granted in this matter, in December 2019, the Attorney General issued an updated IAPP that includes various changes pertaining to confidentiality as well as other subjects. See Attorney General Law Enforcement Directive No. 2019-5. The Attorney General also has since issued other Directives on confidentiality of disciplinary records. See Attorney General Law Enforcement Directive No. 2020-5. We express no views on the amended IAPP or the other Directives; we decide this case based on the IAPP version applicable when the Appellate Division decided this matter and we took certification of the appeal.

43

181, and section 118, there simply cannot be a concurrent investigation of a citizen's police complaint by a CCRB while an IA complaint is under review. For that to be permissible, present statutes would have to be altered to clearly indicate how the two systems could work compatibly or to indicate that the present insulating features of the IA investigatory process no longer enjoy paramountcy.[15] Unless legislative change occurs, we are constrained to preclude the CCRB from employing its delegated authority to conduct a complaint-based investigation in any matter when there is an IA investigation.

---

[15] There is an added complication with use of a record developed before the CCRB that becomes inserted into the process after the completion of an IA investigation that leads to discipline. As noted, the CCRB's findings and recommendation on quantum of discipline are to be considered by the Public Safety Director when that official is ready to impose discipline. Insertion of extra-record material must be reconciled with the hearing rights of the accused officer who has had to defend him- or herself within the IA and discipline process that exists in statute (we make no comment here on any collective bargaining rights that relate to disciplining of police personnel). When an IA investigation culminates in the initiation of formal disciplinary charges, once that discipline process commences, statutes control the process that must ensue. N.J.S.A. 40A:14-147 to -151; see Ruroede v. Borough of Hasbrouck Heights, 214 N.J. 338, 353-55 (2013) (discussing relevant statutes and appeal rights governing the disciplinary hearing and review process for police officers in non-Civil Service jurisdictions, such as is Newark).

The record is plainly the one developed through those processes and does not contemplate evidence from a separately conducted collateral proceeding as envisioned by this Ordinance. It is unclear how findings from a collateral hearing by the CCRB would fit into this carefully plotted IA investigatory scheme culminating in a statutory hearing process.

We accordingly hold that the CCRB's authority to conduct concurrent investigations is invalid.

3.

The problem identified with respect to concurrent investigations does not impair the ability of the CCRB to investigate citizen complaints about police misconduct that are not under IA review. The investigatory power conferred on the CCRB by ordinance is valid and poses no conflict with existing statutory law when it is used to investigate a citizen complaint filed with it and for which no IA investigation is undertaken. In such settings, the CCRB can investigate, conduct its hearing, and make findings of fact and recommendations on the pursuit of discipline to the Public Safety Director.

The Public Safety Director is ultimately in charge of the imposition of discipline; is the official designated to be "the appropriate authority" to set procedures for the police department and, specifically, for the disciplining of officers; and can direct the initiation of formal disciplinary charges against an officer. The chief of police is responsible to him, and we perceive no diminution in the chief of police's authority if the Public Safety Director directs the chief to initiate charges against a police officer after receiving the findings and recommendation of the CCRB, notwithstanding that the IA process was not commenced. We do not view the IA function as the exclusive

45

initiator of such investigations and recommendations about pressing charges against an officer. Once charges are issued, the statutory rights of the officer described heretofore would pertain.

B.

The CCRB has more than investigatory powers. The CCRB has been granted authority to perform various oversight functions. We agree with the Appellate Division, which upheld the Board's roles in creating a disciplinary matrix to be used by the Public Safety Director and conducting oversight reviews and reporting periodically to the Public Safety Director and to the Council.

Oversight review as to the <u>overall</u> performance of the IA function is a beneficial service to this community that had, in the past, lost confidence in the self-monitoring of police personnel. It is a function that we find has support in the general police powers statute. <u>See</u> N.J.S.A. 40:48-2. Newark argues, however, that in addition to the police power statute, this particular power of the CCRB can draw from other statutory authority.

As previously noted, the first sentence of the last paragraph of section 118 preserves for the governing body the ability to create a commission for the oversight purpose of reviewing the operation of the police force. In the context of that paragraph, that reference aligns with the CCRB's (a

46

commission created by the governing body) ability, consistent with its statutory police powers, to review the overall performance of the operation of the police force and make a report to the officials and entities as the Ordinance requires. See Section III of the Ordinance.

We underscore that the preserved power in that sentence of section 118 pertains to review of an overall operation of the police force or, as here, the IA unit's overall operational results, and does not include the ability to review and critique the handling of an individual IA investigation into alleged police misconduct. We do not find that first sentence to authorize an ability to perform a review of the outcome in an individual's disciplinary matter -- in the sense of a second-guessing.

The second sentence of that paragraph preserves to the municipality's executive branch -- its "appropriate authority" and others charged with general administrative duties -- the ability to handle reviews of the performance of individual officers, which would include reviewing the performance of any member of the IA unit, or the IA unit's operations, in connection with an evaluation of the need for, pursuit of, and imposition of discipline for an individual officer. The executive-versus-legislative dichotomy that the amendment to section 118 sought to maintain in order to preserve the police force from political interference is present throughout section 118, including

47

its final paragraph, which merely preserves existing legislative authority (in the first sentence) and executive authority (in the second).

## VI.

Finally, we address the issue of the Ordinance's delegation of subpoena power to its CCRB.

The Council's conferral through this Ordinance of subpoena power on the CCRB cannot be squared with existing statutes. There is no inherent authority for the Council to delegate its subpoena power to a non-legislative body of its creation. To the extent that the Council itself has subpoena power, as recognized in In re Shain, the subpoena power is inherent in and tied to the power to legislate. 92 N.J. 524, 539 (1983). Specifically, we recognized in Shain a City Council's subpoena power under the Faulkner Act, stating that when the Council in a mayor-council plan municipality "exercises the legislative function of the local government[,] [i]nherent in th[e] legislative power is the authority to investigate and to interrogate officials under oath, i.e., to issue subpoenas in furtherance of its proper legislative function." Ibid.

This CCRB is plainly not the Council itself. Moreover, this CCRB -- a commission, comprised of various public members, executive branch officials, and Council members or their designees -- is also plainly not a subcommittee

48

of the Council itself.  Therefore, it cannot derive from the Council the subpoena power recognized in Shain.

Nor can an ability to confer subpoena power derive from the first sentence of section 118's last paragraph.  The preserved power of inquiry that may be granted to commissions created by the governing body is not equivalent, in this setting, to the power to confer subpoena power.  First of all, the Legislature knows how to give to a person or entity the power to subpoena in order to fulfill tasks.  See, e.g., N.J.S.A. 40A:14-148 (hearing officers in police disciplinary hearings "shall have the power to subpoena witnesses and documentary evidence"); N.J.S.A. 40:48-25 (subcommittees comprised of members of municipal governing bodies under Faulkner Act "may issue a subpoena ad testificandum, or subpoena duces tecum").  The reference to the power to inquire is not the same language; it does not say subpoena, a word that the Legislature clearly has used in many places elsewhere.

And, for the reasons expressed, we are not dealing with a sub-delegation of the Council's own legislative power because this is not a subcommittee of the Council acting legislatively for the Council.  While a municipal governing body can delegate its own subpoena power to a subcommittee of its members in furtherance of a proper legislative purpose, N.J.S.A. 40:48-25; see also City of Newark v. Benjamin, 144 N.J. Super. 58, 72 (Ch. Div. 1976), the first

49

sentence in section 118 stops far short of supporting that a municipality now has the power to confer subpoena power on any public-member commission it chooses to create.

In sum, to the extent this CCRB exercises its oversight function, consistent with section 118, we conclude that the referenced "power[] of inquiry" is not equivalent to "subpoena power." As previously noted, the Legislature knows how to confer subpoena power when it chooses to do so; we do not read this reference to inquiry power to lead to the conclusion that it implicates a new authority to now confer subpoena power.

Moreover, to interpret that first sentence in section 118 as a conferral of new authority, as opposed to a preserving of existing power, would be a grand expansion of authority for municipal governing bodies accomplished in an unusual way. It would mean that any commission created by a municipal council comprised of any composition of members could be authorized to wield subpoena power. We do not find a sound basis to conclude that the Legislature intended to give municipalities the ability to widely distribute subpoena power on public-member commissions. To confer subpoena power to this municipally created civilian review board, there needs to be clearly expressed evidence of such intent by the Legislature, as it has provided elsewhere. That said, although the CCRB is not invested with subpoena

50

power, the Ordinance expressly requires the Newark Police Department and its members to cooperate with the CCRB, provided there is no interference with an ongoing IA investigation.

We appreciate that Newark values having a civilian body participating in the oversight of the police function. But the Legislature would have to act in order for the City to have the ability to confer subpoena power on its CCRB.

In closing, we note that the Council, of course, retains its own power to issue subpoenas to call a person before it and to obtain documents, unless they are otherwise made confidential by law. The Council may be motivated to exercise that power as a result of an oversight report from the CCRB about the performance of the IA function in Newark, viewed in its totality, as the Ordinance calls for. This opinion does not mean to suggest that Newark is powerless with respect to access to subpoena power; it is simply that such power remains reposed in the governing body itself to be used, as that body may, to compel an appearance, written testimony, or documents not shielded by law.

## VII.

To the extent FOP argues that the Ordinance's procedures violate the due process rights of officers, we find that challenge premature, as we do not yet know what the Ordinance's procedures will be. However, we note that

51

when the CCRB conducts an initial investigation -- and there is no IA investigation -- the statutory protections trigger if and when the Public Safety Director chooses to impose discipline. Further, as the Appellate Division noted, the CCRB is not an adjudicative body. Fraternal Order of Police, 459 N.J. Super. at 496. Thus, traditional notions of due process may not arise in the CCRB's purely investigative setting.

## VIII.

We modify the judgment of the Appellate Division, affirming in part and reversing in part the conclusions reached. The Ordinance, as modified by this opinion, is sustained.


JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion. CHIEF JUSTICE RABNER filed a dissent.

Fraternal Order of Police,
Newark Lodge No. 12,

Plaintiff-Appellant,

v.

City of Newark,

Defendant-Respondent.

CHIEF JUSTICE RABNER, dissenting

The majority outlines a path municipalities can follow to establish civilian bodies that would have certain powers to review the conduct of local police forces. See, e.g., ante at ___ (slip op. at 44-45). I agree that those steps can be implemented consistent with existing law.

I respectfully differ with the majority, however, because I believe the Newark City Council chose an equally valid course when it passed an ordinance to create a civilian review board with stronger oversight authority, as modified by the Appellate Division. See Fraternal Order of Police, Newark Lodge No. 12 v. City of Newark, 459 N.J. Super. 458 (App. Div. 2019). Largely for the reasons stated in Judge Fasciale's thoughtful opinion, I would uphold the City's ordinance.

1

The City Council enacted Ordinance 6PSF-B (Ordinance) in response to the United States Department of Justice's (DOJ) investigation into alleged civil rights violations by the Newark Police Department. In a July 2014 report, the DOJ found "a pattern or practice of constitutional violations in the [Department's] stop and arrest practices, its response to individuals' exercise of their rights under the First Amendment, the Department's use of force, and theft by officers." The DOJ report recognized "the many Newark officers who abide by the rule of law and commit themselves daily to the difficult, and too often thankless, job of protecting public safety." At the same time, the federal investigation found reasonable cause to conclude that officers disproportionately subjected Newark's Black residents to Fourth Amendment violations.

DOJ also identified deficiencies with the Department's internal affairs system. Out of hundreds of excessive force complaints received from 2007 to 2012, the Internal Affairs Unit sustained only one.

On March 3, 2016, DOJ filed a complaint in federal court. It was resolved with a consent decree on March 30, 2016 and revised about a month later. Meanwhile, the City enacted the Ordinance on March 17, 2016, establishing a civilian complaint review board (CCRB). I write to underscore a few points the Appellate Division ably addressed in its opinion.

2

First, the Ordinance -- like all municipal ordinances -- is "afforded a presumption of validity." Grabowsky v. Township of Montclair, 221 N.J. 536, 551 (2015). In addition, under the State Constitution, courts must "liberally construe[]" laws "in . . . favor" of the authority of local government. N.J. Const. art. IV, § 7, ¶ 11; see also 388 Route 22 Readington Realty Holdings, LLC v. Township of Readington, 221 N.J. 318, 339-40 (2015) ("An ordinance must be 'liberally construed' in favor of its validity." (quoting Rumson Estates, Inc. v. Mayor & Council of Fair Haven, 177 N.J. 338, 351 (2003))).

Second, existing law expressly empowers municipalities to investigate local police forces. N.J.S.A. 40A:14-118 governs the creation of police forces and outlines the powers and duties of the chief of police and others. As the Legislature plainly declared, however,

> [n]othing herein contained shall prevent the appointment by the governing body of committees or commissions to conduct investigations of the operation of the police force, and the delegation to such committees or commissions of such powers of inquiry as the governing body deems necessary or to conduct such hearing or investigation authorized by law.
>
> [N.J.S.A. 40A:14-118 (emphases added).]

The power to investigate the operation of the police force necessarily encompasses the power to investigate its performance.

3

Third, implicit in that clear, strong statutory language is the power to issue subpoenas. As part of its authority to make laws, the governing body of a municipality has the inherent power to conduct investigations for legislative purposes. In re Shain, 92 N.J. 524, 530-31 (1983). That "authority may be fairly implied from [a] legislative scheme" even if it is not "expressly stated" in a statute. Id. at 532.

To gather information needed to carry out its legislative responsibilities, a municipal council, like Newark's City Council, necessarily has the power to subpoena witnesses and other evidence. Id. at 533. A municipality's governing body can also delegate subpoena power to "a committee of its members." N.J.S.A. 40:48-25.

Here, the legislative scheme directly anticipates the delegation of subpoena power to oversight boards in N.J.S.A. 40A:14-118. Fraternal Order of Police, 459 N.J. Super. at 508. To repeat, the Legislature plainly declared that governing bodies may appoint committees "to conduct investigations of the operation of . . . police force[s]," and that "[n]othing [in section 118] shall prevent . . . the delegation . . . of such powers of inquiry as the governing body deems necessary or to conduct such hearing or investigation authorized by law." N.J.S.A. 40A:14-118. In light of that broad language, it was not

4

necessary for the Legislature to include the term "subpoena power" in the statute to fairly imply the power was conveyed. See Shain, 92 N.J. at 532.

Armed with the above authority, the City Council reasonably concluded it was necessary to provide the CCRB with subpoena power. Indeed, without the power to compel witnesses and other evidence by subpoena, it is difficult to see how the CCRB or a similar review board could gather the information it would need to effectively "investigat[e] . . . the operation of the police force" -- as the law contemplates. See N.J.S.A. 40A:14-118; Shain, 92 N.J. at 533. City of Newark v. Benjamin, 144 N.J. Super. 58, 68 (Ch. Div.), aff'd 144 N.J. Super. 389 (App. Div. 1976), aff'd 75 N.J. 311 (1978), does not call for a different result. The case involved whether an elected civilian review board could be created by voter initiative -- not a municipal ordinance -- in a Faulkner Act city, and the ruling preceded the relevant language in section 118. Ibid.; compare L. 1971, c. 197, § 626, with L. 1981, c. 266, § 1.

The "necessary and proper" clause of N.J.S.A. 40:48-2 offers further authority for the Council's action. The statute provides that "[a]ny municipality may make . . . and enforce . . . ordinances . . . it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants." N.J.S.A. 40:48-2.

5

As the Appellate Division observed, this Court has "consistently held [N.J.S.A. 40:48-2] is itself a reservoir of police power." Fraternal Order of Police, 459 N.J. Super. at 511 (alteration in original) (quoting Inganamort v. Borough of Fort Lee, 62 N.J. 521, 536 (1973)). The law is "an express grant of general police powers to municipalities . . . made impregnable by . . . continued legislative acquiescence . . . , by the mandate of Article IV, Section 7, Paragraph 11 of the Constitution of 1947 that acts concerning municipalities be liberally construed, and by . . . more recent judicial decisions." Inganamort, 62 N.J. at 536 (quoting Fred v. Borough of Old Tappan, 10 N.J. 515, 520 (1952)).

In my judgment, existing law permitted the Council to delegate subpoena power to the CCRB.

Finally, N.J.S.A. 40A:14-181, which directs local law enforcement to adopt and implement guidelines for internal investigations consistent with those promulgated by the Attorney General, does not control local review boards. Section 181 expressly applies to law enforcement agencies, not civilian oversight boards. The statute does not conflict with N.J.S.A. 40A:14-118, and the two laws should be read in a way that reconciles them. See Jones v. Morey's Pier, Inc., 230 N.J. 142, 164 (2017) ("When . . . we construe multiple statutes, we follow the principle that '[s]tatutes that deal with the

same matter or subject should be read in pari materia and construed together as a unitary and harmonious whole.'" (alteration in original) (quoting St. Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 14-15 (2005))).

The Attorney General, in fact, notes that nothing in its revised internal affairs guidelines bars a civilian review board from accepting complaints from the public and conducting its own investigations. Yet the guidelines in effect prevent access to a police department's internal affairs records if a civilian review board does not satisfy the requirements imposed by the Attorney General. To be clear, section 181 does not empower the Attorney General to override the authority the Legislature granted municipalities and civilian review boards to investigate the operation of local police forces under section 118.[1]

---

[1] As to confidentiality, the Ordinance bars the CCRB from releasing the identity of complainants and witnesses, as well as any "personally-identifiable information" about them, during an investigation. City of Newark, N.J. Rev. Gen. Ordinances (Newark Ordinances) 2:2-86.5, § 1-07 (2019). Although the Ordinance originally provided that, if a "complaint is substantiated . . . the complainant's identity may be released in the course of any public hearing about the alleged misconduct," the Appellate Division properly invalidated that section. Fraternal Order of Police, 459 N.J. Super. at 481. Elsewhere, the Ordinance requires the CCRB to keep confidential information that would otherwise reveal the identity of officers subject to investigation. Newark Ordinances 2:2-86.5, §§ 1-17(d), 1-20(a), 1-21(a). In short, the identity of complainants, witnesses, and police officers under investigation are kept confidential under the Ordinance.

For those and other reasons set forth in the Appellate Division's decision, I would uphold the City Council's Ordinance.  Although the majority states it is sustaining the Ordinance as modified, see ante at __ (slip op. at 4, 52), very little of the Appellate Division's judgment, or the real authority of the CCRB, remains intact.  Under the Ordinance as modified by the Appellate Division, which I would uphold, Newark's civilian complaint review board could conduct investigations of the local police force similar to other civilian oversight boards throughout the nation.  See Udi Ofer, Getting It Right: Building Effective Civilian Review Boards to Oversee Police, 46 Seton Hall L. Rev. 1033, 1041-43, 1053-61 (2016).

I respectfully dissent.